## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

GRETA SEMSROTH, et al.,           )
                                  )
                    Plaintiffs,   )
                                  )
v.                                )         Case No. 04-1245-MLB-DWB
                                  )
CITY OF WICHITA, et al.,          )
                                  )
                    Defendants.   )
_____)

## MEMORANDUM AND ORDER

Before the Court is Defendants' oral motion for Plaintiffs to pay all or part of the costs relating to the discovery of Defendants' electronic mail.  Plaintiffs filed a Brief Addressing Cost-Shifting for Discovery of Electronic Mail (Doc. 58), opposing the shifting of any cost burden from Defendants to Plaintiffs.  Defendants filed a Memorandum Addressing Cost-Shifting for Discovery of Electronic Mail (Doc. 63), in support of its oral motion, and Plaintiffs filed an additional Reply Memorandum Regarding Shifting Costs of Discovery of Electronic Evidence (Doc. 66).  After discussion about this matter at a scheduling conference, Plaintiffs filed a Supplemental Memorandum (Doc. 117), and Defendants also filed a Supplemental Memorandum, with an attached Affidavit of Kevin Norman (hereafter Norman Aff.), and excerpts from several deposition transcripts.  (Doc. 121).

## BACKGROUND

Plaintiffs, female officers of the City of Wichita's ("City") police department, filed suit against the City, the Police Department, and Chief Norman Williams in his individual and official capacities, alleging a multitude of violations of federal and state law.  Plaintiffs allege that, while working for the City, they were subject to, among other things, sexual harassment, hostile work environment, gender discrimination, and violations of their equal protection and due process rights in violation of various federal and state laws.  *See generally,* Plaintiffs' Amended Complaint.  (Doc. 53).

The case was filed as a class action, but the District Court denied Plaintiffs' motion to certify a class.  (Doc. 86).  The undersigned magistrate judge later denied Plaintiffs' motion to amend their complaint in order to re-assert class claims.  (Doc. 118).  As a result, this case now involves only the claims of the four named plaintiffs.

During discovery, Plaintiffs requested information relating to e-mails sent to or by other officers within the Wichita Police Department. Through negotiations, the parties narrowed that request to copies of e-mails from 117 different supervising officers to the extent that such e-mails exist on a back-up tape of July 23, 2004.

Defendants store e-mail information only on (1) their active user e-mail files and (2) on back-up tapes.  Plaintiffs assert that a search of current active user files is inadequate because there is no way to obtain information regarding past deleted e-mails.  Thus, the back-up tape is the only real source of information regarding e-mails in existence on July 23, 2004, but that may have been deleted thereafter.

The City keeps back-up tapes for disaster recovery purposes only, and not to retrieve information.  Thus, in order to conduct a word search of the e-mails contained on a given back-up tape, the City would have to restore the back-up tape to an e-mail server.  Because of recent hardware upgrades, the City has an Exchange 5.5 server available for such a restoration.  However, despite such hardware availability, the City claims that new software and labor costs would be substantial.  The current dispute revolves around who should pay the costs of restoring the back-up tapes and retrieving the requested information from the July 23, 2004, back-up tape.[1]

Kevin Norman is the person who has supervised and monitored work of the City's IT/IS Department in this case.  In his most recent affidavit (Doc. 121,

---

[1] Defendants have not claimed that the requested search of e-mails is irrelevant within the meaning of Fed.R.Civ.P. 26(b)(1), and it does appear that such a search is reasonably calculated to lead to the discovery of relevant evidence.  Defendants' motion only asks to shift the cost of the e-mail search to Plaintiffs' either in whole or in part.

Norman Aff.), Norman reviews the actions the City has taken to date to comply with Plaintiffs' demands for discovery of electronic data and specifically e-mail.[2] There are two ways to search the e-mail files of the 117 supervisors for the specific words Plaintiffs' have requested: (1) By use of a software program known as Discovery Attender which will search the entire back-up tape at once after it is restored and loaded on the Exchange 5.5 server; and (2) a "manual" search of the copies of 117 e-mail accounts of these supervisors which the City has copied as .pst files. The manual method requires that each .pst file be loaded and then searched using the Microsoft Outlook search feature by searching the subject and message bodies of all e-mails. Norman notes that under the manual system, each .pst file would have to be searched multiple times depending on the number of keywords desired, then any identified e-mail message would have to be opened and copied to a separate folder. (Doc. 121, Norman Aff. ¶¶ 5, 7).

Norman sets out the costs of the proposed search using the two alternative methods. To use the Discovery Attender software program would require that this

---

[2] Norman states that the City IT staff has already spent $20,560.20 for past work related to electronic discovery requests by Plaintiffs in this case. (Doc. 121, Norman Aff. ¶ 3). Those expenses include $16,710.20 to purchase additional back-up tapes and two tape drives in order for the City to be able to retain past data. (Doc. 63, Norman Aff. ¶ 4).

software be purchased at an estimated cost of $2,224.95[3] which includes the cost of shipping, handling and minimal support. The software would then be loaded by City IT/IS staff on the server and they would run the search of the back-up tape using the words requested by Plaintiffs.  To search the 117 e-mail boxes on the back-up tape for the seventeen (17) words identified by Plaintiffs would take an estimated 8 hours at a rate of $50 per hour, bringing the total estimated cost to $2,624.95.  (Doc. 121, Norman Aff. ¶ 6).

To do the search "manually," *i.e.,* by having the City's IT/IS staff search the .pst files individually using Microsoft Outlook, is estimated to take 20 minutes for each of the 117  mailboxes for supervisors which, at an hourly rate of $50, would be approximately $1,950.  This process is labor-intensive and more subject to human error, and the time (and therefore cost) could be greater in the event numerous documents are located and need to be loaded to other files.  (Doc. 121, Norman Aff. ¶ 7-8).

Plaintiffs argue that the cost of this electronic discovery should be borne by Defendants as the producing party, and that requiring the City to expend these costs would not constitute an "undue burden" on the City.  The City seeks a

---

[3] This was the cost quoted to Norman on May 26, 2006.  (Doc. 121, Norman Aff. ¶ 5).

protective order which would require that the costs of this search should be borne, at least in part, by Plaintiffs.  The City notes that it has no future use for the Discovery Attender software, it would not buy that software absent an order of the Court, there is no evidence that the search of the back-up tape will even find any of the words identified by Plaintiffs for use in a search, and the burden of compliance with Plaintiffs' requested discovery would be an undue burden on Defendants.

The Court has withheld ruling on this issue in the hope that the parties would be able to reach some compromise concerning e-mail production that would satisfy both sides.  During the time since this issue was first raised, the parties have apparently explored various ways to accomplish a search of the specific back-up tape in issue, but no agreement has been reached.  Plaintiffs have proposed alternative methods of searching which would have Plaintiffs' expert conduct the search, but the City has refused these alternatives since the electronic data to be search contains highly confidential information.

## DISCUSSION

While there is a presumption that the responding party will bear its own costs of production, the Federal Rules permit the Court to grant a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c).  Trial courts have discretion in

determining when a protective order is appropriate.  See ***Boughton v. Cotter Corp.***,

65 F.3d 823, 828 (10th Cir. 1995) (stating that a trial judge's grant of a protective

order will be reviewed for abuse of discretion).  Additionally, "the party seeking a

protective order has the burden to demonstrate good cause." ***Horizon Holdings,***

***L.L.C. v. Genmar Holdings, Inc.***, 209 F.R.D. 208, 214 (D. Kan. 2002) (citation

omitted).  The moving party must make "a particular and specific demonstration of

fact, as distinguished from stereotyped and conclusory statements." ***Gulf Oil Co.***

***v. Bernard***, 452 U.S. 89, 102 n.16, 101 S. Ct. 2193, 2201, 68 L.Ed.2d 693 (1981)

(quotation omitted).

 The current version of the Federal Rules of Civil Procedure provide some

general guidance in determining what constitutes good cause for granting a

protective order.  Fed. R. Civ. P. 26(b)(2) provides that

> [t]he frequency or extent of use of the discovery methods
> otherwise permitted under these rules and by any local
> rule shall be limited by the court of it determines that . . .
> (iii) the burden or expense of the proposed discovery
> outweighs its likely benefit, taking into account the needs
> of the case, the amount in controversy, the parties'
> resources, the importance of the issues at stake in the
> litigation, and the importance of the proposed discovery
> in resolving the issues.

Commentators have opined that this rule "should be used to discourage costly,

speculative, duplicative, or unduly burdensome discovery of computer data and

systems."  MANUAL FOR COMPLEX LITIGATION (4th) § 11.446.

An amendment to Fed.R.Civ.P. 26(b)(2) will become effective on December 1, 2006, and this amendment was "designed to address issues raised by difficulties in locating, retrieving, and providing discovery of some electronically stored information."  Advisory Committee Note on Amendment to Rule 26(b)(2). Pursuant to amended Rule 26(b)(2)(B),

> [a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost.  On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost.  If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).  The court may specify conditions for the discovery.

Therefore, the burden of establishing that the information is not reasonably accessible because of undue burden or cost is on the party responding to the discovery request, in this case the City.

Once it is shown that the source of electronically stored information is not reasonably accessible, the requesting party, here Plaintiffs, may still obtain discovery by showing good cause, considering the limitations of amended Rule 26(b)(2)(C), which balance the costs and potential benefits of the proposed

8

discovery.  The amended Rule 26(b)(2)(C) – which is substantially the same as

present Rule 26(b)(2)(iii) – provides that

> [t]he frequency or extent of use of the discovery methods
> otherwise permitted under these rules and by any local
> rule shall be limited by the court if it determines that: . . .
> (iii) the burden or expense of the proposed discovery
> outweighs its likely benefit, taking into account the needs
> of the case, the amount in controversy, the parties'
> resources, the importance of the issues at stake in the
> litigation, and the importance of the proposed discovery
> in resolving the issues.  The court may act upon its own
> initiative after reasonable notice or pursuant to a motion
> under Rule 26(c).

## A.   DEFENDANT'S CHOICE OF STORAGE MEDIA

As a preliminary matter, Plaintiffs argue that the City's choice of data

storage systems and Plaintiffs' lack of control over such choice require the Court to

deny the motion.  Plaintiffs cite ***In re Brand Name Prescription Drugs §Antitrust***

***Litigation*** for the proposition that Defendants should not be able to shift the costs

of production where the costs are the result of the back-up system chosen and

implemented by Defendants.  Case No. 94-897, 1995 WL 360526, at *1–3 (N.D.

Ill. 1995).  The Court rejects this bright-line argument.

While courts have, in the past, rejected requests for cost-shifting where the

requesting party chose a difficult-to-access storage media, most courts are now

moving toward a more sophisticated approach of considering various factors in

9

deciding whether to shift the costs of electronic discovery.  Paul M. Robertson &

Lawrence T. Stanley, Jr., *Electronic Discovery: a Survey of Relevant Law and*

*Recent Developments*, Committee on Pretrial Practice and Discovery, vol. 13, No.

1 at 11 (Winter 2005).

The Court is not aware of any decision since ***Zubulake v. UBS Warburg***

***LLC,*** 217 F.R.D. 309 (S.D.N.Y. 2003) (***Zubulake I***), that unequivocally prohibits

cost-shifting where the Defendant voluntarily utilized storage technology that is

difficult to access or restore.  Furthermore, the Court has discretion in determining

whether to shift the costs of discovery.  *See **Oppenheimer Fund, Inc. v. Sanders***,

437 U.S. 340, 358, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978) (stating, in dicta, that

district courts may, in their discretion, condition discovery on the requesting

party's payment of costs); 8 Charles Alan Wright, Arthur R. Miller & Richard L.

Marcus, FEDERAL PRACTICE AND PROCEDURE, § 2038 (2d ed. 1994) (stating that

the "court may order the party seeking discovery to pay the expenses caused

thereby though it is not required to do so") (citations omitted).

The Court is cognizant of the possibility that potential litigants might

intentionally retain stored data in an inaccessible media in order to deter discovery

in litigation.[4]  Where, as here, the storage media is reasonably related to the

purposes for which the information is retained, the court will not automatically

require that party to bear the costs of retrieving the information.  *Cf.* **Oppenhiemer**

**Fund**, 437 U.S. at 359 (noting that a defendant may be required to bear the costs of

information retrieval when it would perform such retrieval in the ordinary course

of its business).

Defendants state, and Plaintiffs do not challenge, that the City's back-up e-

mail information was kept for the sole purpose of disaster restoration.  The

Advisory Committee Note to the Proposed Amendment to Rule 26(b)(2)

acknowledges that certain information "can be located, retrieved, or reviewed only

with very substantial effort or expense."  As an example, the Committee identifies

information "stored solely for disaster-recovery purposes" – like the information at

issue.  It is, therefore, apparent that Defendants' storage choice was not only

common, but anticipated by those drafting the amendments to the Federal Rules of

---

[4]  The Advisory Committee considered the possibility that the revised Rule 26(b)(2)(B) might encourage companies to "bury" information in some inaccessible format in order to keep it from being discovered in litigation, but noted that this conduct would be subject to sanctions under both the present and the proposed rules.  Advisory Committee Note on Proposed Amendment to Rule 26(b)(2) (May 27, 2005, revised July 25, 2005).

Civil Procedure.[5]  The Court thus finds that back-up tapes were a reasonable

storage method for such purpose, and assigns no fault to Defendants for utilizing

such method.

## B.   COST THRESHOLD

Plaintiffs also argue that the low cost of compliance in this case

(approximately $2624.95),[6] in relation to compliance costs for electronic discovery

in other cases, makes any cost-shifting analysis totally unnecessary.  Again, the

Court disagrees with this bright-line argument.

In an early case, the Supreme Court stated that there may be circumstances

where costs should not be shifted because the expenses involved are "so

insubstantial as not to warrant the effort required to calculate it and shift it to the

[requesting party]."  ***Oppenheimer Fund***, 437 U.S. at 359 (considering cost-

shifting in the context of a disclosure of information for the purpose of class

_____

[5]  This is not a case where a party has converted data into an inaccessible format at a time when it should have reasonably anticipated litigation and should have anticipated that the data would be discoverable in such litigation.  *Cf.* ***Quinby v. WestLB AG,*** No. 04-7406-WHP-HBP, 2006 WL 2597900 at * 9 (S.D.N.Y., Sept. 5, 2006).  In this case, the data was transferred to back-up tapes on a regular basis and there is no contention that Defendants intentionally placed the material in an inaccessible format in order to avoid production.

[6]  This is the future cost to restore and search the back-up tape and does not consider the past costs the City has incurred in connection with electronic discovery issues.  *See* Note 1, *supra.*

notification under Fed. R. Civ. P. 23).  The ***Oppenheimer*** court cited, as an

example of such insubstantial costs, the expense of making files available for

inspection. *Id*. (citing ***In re Nissan Motor Corp. Antitrust Litigation***, 552 F.2d

1088 (5th Cir. 1977)).  After ***Oppenheimer***, and early in the history of electronic

discovery, some courts did focus on whether the cost of compliance was

"excessive or inordinate," but generally refused to set out an ironclad formula

which would determine what was "undue" within the meaning of the federal rules.

*See e.g.,* ***Bills v. Kennecott Corp.,*** 108 F.R.D. 459, 463-64 (D.Utah, 1985)

(refusing to require payment of $5,411.25 by plaintiffs-employees to obtain

computer records from their employer).  Likewise, courts[7], commentators[8], and the

drafters[9] of the Federal Rules of Civil Procedure have repeatedly stated that the

---

[7]  *See* ***Seattle Times, Co. v. Rhinehart***, 467 U.S. 20, 36, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984) (stating that Fed. R. Civ. P. 26(c) "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required"); ***F.T.C. v. Shaffner*** 626 F.2d 32, 38 (7th Cir. 1980) ("What is unduly burdensome depends on the particular facts of each case and no hard and fast rule can be applied to resolve the question.").

[8]  *See* 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE, § 2036 (2d ed. 1994) (stating that, in deciding a motion for protective order, "a court may be as inventive as the necessities of a particular case require in order to achieve the benign purposes of the rule"); Dan Harshman, *Rise of the Machines: A Critical Look at the New Electronic Discovery Standards*, Business Torts Journal, Summer 2004, at 1, 7 ("The drafters of Rule 26 intended that it be a flexible rule capable of addressing many situations.").

[9]  Fed R. Civ. P. 26 Advisory Committees Note, 1970 Amendment, subdivision (b) — Scope of Discovery (noting that Rule 26 may cover situations "not capable of

rules are made intentionally flexible in order to allow courts to consider the relevant factors of each case.  "[E]ven a very slight inconvenience may be unreasonable if there is no occasion for the inquiry and it cannot benefit the party making it."  8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE, § 2036 (2d ed. 1994).  Thus, the Court finds that an analysis is necessary to determine whether the cost and expense of complying with the discovery request would be unduly burdensome to Defendants under the facts of this case.

## C.    COST-SHIFTING FACTORS

The Court has found no Tenth Circuit case dealing with cost-shifting of electronic discovery between parties.[10]  The current leading case on cost-shifting is *Zubulake I*, 217 F.R.D. 309 (S.D.N.Y. 2003), which has been cited by both parties.  *See also **Zublake v. UBS Warburg LLC,*** 216 F.R.D. 280 (S.D.N.Y. 2003) (***Zubulake III***).

_____

governance by precise rule, in which courts must exercise judgment").

[10]  The Tenth Circuit has ordered cost-shifting where a <u>non-party</u> faced a substantial discovery burden to comply with a subpoena duces tecum.  *See **In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation***, 669 F.2d 620, 623–624 (10th Cir. 1982) (requiring a requesting party to pay the costs of complying with its subpoena duces tecum –  $8,782.98, which included the costs of the subpoenaed non-party's staff time to search for the requested records –  because the discovery request was for the benefit of only the requesting party).

14

In *Zubulake I*, the court considered whether the plaintiff should bear the cost of complying with her discovery requests relating to the production of e-mails stored on back-up tapes. The defendant estimated that production would cost approximately $175,000.00. *Id.* at 316. *Zubulake I* established a two-part test for determining when cost-shifting is appropriate for electronic discovery requests. The first inquiry is whether the requested discovery is unduly burdensome. *Id.* at 318. The court determined that "whether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format."[11] *Id.* After finding that some of the information was contained on inaccessible back-up tapes and, therefore, unduly burdensome to produce, the court applied a multi-factor test to determine whether cost-shifting was appropriate.

*Zubulake I* modified the test applied in *Rowe Entertainment, Inc. v. The William Morris Agency, Inc.*, 205 F.R.D. 421 (S.D. N.Y. 2002) to create its own test. The Court established seven factors to be considered in descending order of importance: (1) the extent to which the request is specifically tailored to discover

---

[11]  Back-up tapes are considered an inaccessible format under *Zubulake's* analysis because the data is not organized for retrieval of individual documents and it is usually more time-consuming and expensive to restore the data due to the fact that the data has been compressed. *Id.* at 319.

relevant information; (2) the availability of such information from other sources; (3) the total cost of production compared to the amount in controversy; (4) the total cost of production compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the information. *Zubulake I*, 217 F.R.D. at 322. The court noted that the first two factors (comprising the "marginal utility test") were the most important, the second three factors were the next most important, and the final two factors would rarely make any difference, but could be very important in the few cases to which they would apply. *Id*. at 323.

The analysis in *Zubulake I* (and the application of those factors in *Zubulake III*) must be considered in connection with the later amendment to Rule 26(b)(2) which will become effective on December 1, 2006. The proposed rule requires a balancing of the costs and potential benefits of discovery, and the Advisory Committee identified several items to be considered, including:

> (1)    the specificity of the discovery request;
>
> (2)    the quantity of information available from other and more easily accessed sources;
>
> (3)    the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed

sources;

(4)    the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources;

(5)    predictions as to the importance and usefulness of the further information;

(6)    the importance of the issues at stake in the litigation; and

(7)    the parties' resources.

Advisory Committee Notes to Rule 26(b)(2).  The similarity between these considerations and the factors in ***Zubulake I*** is readily apparent.  The court finds all of these factors to be instructive.  The Court agrees, however, that these factors should not be treated simply as a check-list which is mechanically applied to every case and where the decision to shift costs is made solely on the basis of how many factors are present in a particular case.  *See e.g.,* ***Zubulake I***, 217 F.R.D. at 322-23; ***Zubulake III***, 216 F.R.D. at 289.

## D.    INACCESSIBLE MEDIUM AND UNDUE BURDEN

Here, as in ***Zubulake***, the data sought is on an medium which can be classified as "inaccessible," *i.e.,* back-up tapes, which must be restored before they can be searched for relevant data.  This *suggests* that the process of producing such data could constitute an undue burden on Defendant. *See* ***Zubulake***, 217 F.R.D. at

17

318 ("whether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format.").  However, the Amendment to Rule 26(b)(2)(B) makes clear that any inaccessibility must be "because of undue burden or cost."  This brings into play Plaintiffs' argument that the costs in this case are not so significant as to cause an undue burden on the City.

The City states, however, that it has already spent over $20,000 for work prior to May 17, 2005, in connection with electronic discovery requests from Plaintiffs, including the purchase of back-up tapes and two tape drives.  (Doc. 121, Norman Aff. ¶ 3; Doc. 63, Norman Aff. ¶¶ 3-4).  The City argues that the *total costs* – the City's past expenditures plus any future costs to restore and search the e-mail – are substantial and burdensome.  (Doc. 121 at 1-2).  For purposes of cost-shifting in this case, the court believes that it should consider not only the future costs to either (1) acquire the search hardware (Discovery Attender), or (2) to conduct a search on the .pst files using Microsoft Outlook, but it should also consider the costs which the City has already incurred that were directly related to restoring or searching e-mails.[12]

---

[12]   The City also discusses the additional time that will be required to review any e-mails that are retrieved as a result of any search and to remove any protected material such as information concerning criminal investigations or crime victims.  (Doc. 121 at 3). That time, however, is not subject to cost-shifting.  *See **Zubulake III,*** 217 F.R.D. at 290 (the responding party should always bear the cost of reviewing and producing electronic data once it has been converted to an accessible form).

The court has reviewed the itemization of prior work done by the City's IT/IS Department which was attached to Mr. Norman's earlier affidavit. (Doc. 63, Norman Aff. ¶ 3). It appears that much of the early work in October and November, 2004, was directed to issues concerning the back-up of the City's TSM system which was the subject of an earlier motion by the City. *See* Defendants' Motion for Protective Order, October 8, 2004, Doc. 24. In that motion, the City was concerned with Plaintiffs' demand for preservation of electronic data and the affect any such order would have on the City's automated back-up of the TSM system. At that time, the court was advised that the TSM system was a disaster retrieval system that was separate from the City's e-mail system and that the City had already created back-up tapes of the City's e-mail system. (Doc. 27 at 4, n. 1). Therefore it appears to the court that the acquisition of the two new tape drives and additional back-up tapes, *see* Doc. 63, Norman Aff. ¶ 4, had nothing to do with preservation of the City's e-mail system. The court does note that the City staff did spend time creating .pst files for certain listed employees and supervisors and researching issues concerning the Exchange 5.5 server restoration, all of which appear to be directly related to the e-mail search issue. The court can identify such work done on December 2, 3, 6 and 8, 2004, and on March 7, 9 and 11, 2005, which appears to fall in this category. *See* Doc. 63, Norman Aff. ¶ 3 and attached

19

Consulting Time Report.  The total cost reported for those specific activities is approximately $1,150.

Therefore, for purposes of considering the cost to the City of restoring and searching the single e-mail back-up tape, it appears that the total costs would not exceed $3,374.95 (prior staff time of $1,150 and acquisition of Discovery Attender and future staff time to restore and search e-mails of $2,624.95).[13]  While this pales in comparison to the estimated costs in **_Zubulake III_** (approximately $166,000 to restore and search 94 back-up tapes)[14] and **_Quinby_** ($226,266.60 to restore and search six former employees' e-mails on an expedited basis),[15] it is not an insignificant cost.

While it is somewhat questionable whether these total costs make the e-mails stored on back-up tape "not reasonably accessible because of undue burden or cost," as required by the proposed amendment to Rule 26(b)(2)(B), the court

---

[13]  The court realizes that adding these two specific items is not wholly consistent. The City chose to copy the 117 e-mail boxes onto .pst files some time ago.  Those .pst files will _only_ be used if the City chooses to search the e-mails using Microsoft Outlook. In that case, the total estimated costs would be $3,100 (the prior staff time of $1,150 to copy the files to .pst format and the search time of $1,950).  The alternative of using Discovery Attender will cost $2,624.95.

[14]  216 F.R.D. 282-283.  The estimated expenses in this case are less than the expenses incurred in restoring and searching a sample of five back-up tapes in **_Zubulake III_**, which cost $19,003.43.  _Id._

[15]  2006 WL 2597900 at * 14, n. 21.

will proceed to analyze the cost-shifting issue based upon the factors identified in *Zubulake I* and the amended Rule 26(b)(2)(C).

**E.**   **APPLICATION OF COST SHIFTING FACTORS IN THIS CASE**

The ultimate question is whether the burden of complying with the discovery request outweighs the likely benefit of the proposed discovery. *Zubulake I*, 217 F.R.D. at 322-23 ("Put another way, 'how important is the sought-after evidence in comparison to the cost of production?'").  The factors to be considered should be directed toward, and subservient to, this ultimate question.

Thus, the first inquiry should be to ask what are the benefits to be derived from the discovery, particularly: (1) what is the likelihood that the discovery will uncover relevant information, and (2) what is the potential value of that information in resolving the issues in the case.  Then, these benefits should be compared to the cost burden resulting from the discovery, again asking particularly: (3) the total cost of the production compared to the amount in controversy, and (4) the total cost of production compared to the resources available to each party.  The court believes that these factors should all be given such weight as may be justified by the facts of the individual case as they are all critical to the ultimate question of whether the costs outweigh the likely benefits of production.

The cost for the anticipated restoration and search of the e-mail back-up tape is well established in the record and is not disputed.  Neither party has speculated, however, on the possible recovery that these four named plaintiffs might receive were they to prevail in their claims.  The court is unable on the record to make any such determination itself.  However, since the case now deals only with these four named Plaintiffs and not with a class, any projected recovery would appear to be far less than Plaintiffs might have initially anticipated when the case was filed.  Even so, the costs of restoring and searching the e-mail back-up tape does not seem excessive when compared to the possible amount in controversy.

On the other hand, any cost-shifting to Plaintiffs will necessarily be borne now by only the four Plaintiffs, and not spread among a larger number of class members.  The parties also failed to present any evidence as to the relative financial position of the parties, but the court can properly assume that the four Plaintiffs have significantly less financial capability to pay these costs than does the City.  However, it should also be considered that as a governmental entity, the City's ability to shoulder significant discovery costs is not comparable to the investment banking organizations in both *Zubulake* and *Quinby*,[16] and the source of

---

[16]  The defendant in *Quinby* had assets in excess of 265 billion Euros, and USB Warburg had net profits for the third quarter of 2002 alone of over $700 million.

any such monies comes from public rather than private sources.  Considering all of the cost factors, the court believes that they weigh slightly against any cost-shifting.

The more problematic matter involves the two "benefit" factors.[17] Discovery in the case is now concluded except for the unresolved issue concerning the e-mail back-up tape.  Plaintiffs note in their Supplemental Memorandum  that some e-mails have been produced in discovery and have been discussed in depositions.  (Doc. 117 at 3-5).  However, the deposition excerpts cited by Plaintiffs do not appear to provide any *direct evidence* of gender discrimination or retaliation against Plaintiffs. While the court realizes that a party cannot predict with *certainty* that a proposed discovery method will lead to the discovery of important evidence, the more likely it is that the back-up tape contains important, relevant evidence to Plaintiffs' claim, the fairer it is to require the City to search at its own expense.  *Cf. Zubulake I*, 217 F.R.D. at 323 (citing *McPeek v. Ashcroft,* 202 F.R.D. 31, 34 (D.D.C. 2001)).

In  *Zubulake III,* even though several e-mails had been produced as a result

_____

[17]  These factors are similar to the ones identified by the Advisory Committee concerning the likelihood of finding relevant, responsive information and predictions as to the importance and usefulness of the further information.  *See* Advisory Committee Notes to Amendment of Rule 26(b)(2).

of a sample restoration and search of only a few back-up tapes, the court concluded

that the plaintiff had not been able to show that there was indispensable evidence

on the back-up tapes, and the success of the full search was somewhat speculative.

216 F.R.D. at 289.  The same situation appears to be present in this case.  While

Plaintiff has identified testimony that there have been some e-mails seen by a

Plaintiff that she indicated "would probably upset a female officer," Doc. 117 at 4,

this is not a strong indication that a search of the e-mails of 117 supervisors (many

of whom were not the direct supervisors of any of the four Plaintiffs)[18] would

likely produce *direct evidence* of gender discrimination or retaliation.  The portions

of the Plaintiffs' depositions provided by Defendants reinforces this conclusion.

*See* Doc. 121, Attached Deposition Excerpts.  Therefore, the benefit factors weigh

in favor of cost-shifting.

---

[18]  Plaintiffs here are claiming a pattern and practice of gender discrimination in the Wichita Police Department and thus seek broad discovery from supervisors other than those directly over the four named Plaintiffs.  While Plaintiffs may be entitled to seek evidence concerning the actions of other supervisors, *see e.g., **Mendelsohn v. Sprint/United Management Co.,** *__F.3d __, 2006 WL 308664 at * 3 - 4 (10th Cir. 2006) (refusing to extend the "same supervisor" rule to cases where a plaintiff claims to be the victim of company-wide discrimination rather than allegations of discriminatory *disciplinary* action), the likelihood that such a broad search will lead to direct evidence of discrimination is not particularly strong.  Moreover, many of Plaintiffs' claims involve alleged retaliation against these four Plaintiffs as a result of their filing of this case.  *See e.g.,* Doc. 118 at 9, n. 4.  As to those claims, discovery as to other supervisors would not appear to be appropriate since it would seem that any retaliation would come from the Plaintiffs' direct supervisory chain.

Most of the other factors outlined in either **Zubulake** or the amendments to Rule 26(b)(2), are not particularly relevant to the analysis in this case.  For example, the Court does agree with **Zubulake** that while other factors such as the importance of the issues at stake in the litigation and the relative benefits to the parties of obtaining the information *rarely* may be relevant, they may be vital to the analysis under the certain circumstances.  Thus, highly important litigation[19] may require greater latitude in cost-shifting than more isolated cases, and cases where there is a definite benefit to the responding party may weigh against cost-shifting.[20]

While this obviously is an important case to the four Plaintiffs, the court is inclined to agree with **Zubulake** that a workplace discrimination claim probably is

---

[19]  The Court agrees with the **Zubulake** court's general statement of the types of cases that might involve particularly important issues.  While all litigation is important to determining and preserving the individual rights of the parties involved, on rare occasions, litigation will arise that is important on a much broader scale.  Examples of such litigation include cases with the potential for broad public impact such as toxic tort class actions, environmental actions, "impact" or social reform litigation, cases involving criminal conduct, and cases involving important legal or constitutional questions.  217 F.R.D. at 321.  In those cases, the costs of discovery must be weighed in relation to the social impact of the outcome of the case, not just the economic impact to the litigants involved.  *See also,* **Quinby v. WestLB AG,** No. 04-7406-WHP-HBP, 2006 WL 2597900 at * 9 (S.D.N.Y., Sept. 5, 2006).

[20]  A court may, among other circumstances, find benefit to the responding party where it would restore the information for its own discovery purposes or in its normal course of business.  There appear to be no special circumstances in this case that would indicate that the City would benefit from the restoration of the back-up tape.

not the type of case that warrants special consideration as to cost-shifting.

Interestingly, both *Zubulake* and *Quinby*, like the present case, involve claims of gender

discrimination in the workplace.  Although both courts acknowledge that discrimination

is an important problem, neither considered such a case to be unique or novel in nature,

and therefore gave little or no consideration to this factor.  *Zubulake III,* 216 F.R.D. at

289; *Quinby*, 2006 WL 2597900 at * 15.  As the court stated in *Zubulake III*,

> [i]f I were to consider the issues in this discrimination case
> sufficiently important to weigh in the cost-shifting analysis,
> then this factor would be virtually meaningless.  Accordingly,
> this factor is neutral.

216 F.R.D. at 289.  Even though suits alleging discrimination in the workplace of a *public*

employer may seem more like "social reform litigation" than suits involving only *private*

employers, the court still believes that it would be unwise to treat this case as one

requiring some special consideration for purposes of cost-shifting.

## CONCLUSION

After consideration of the briefs of the parties, and considering the specific

circumstances of this case, the court cannot conclude that cost to the City of

restoring and searching the single e-mail back-up tape of July 23, 2004, is such as

to render that back-up tape "not reasonably accessible because of undue burden or

cost."   *See* Amendment to Rule 26(b)(2)(B).  The court is not unsympathetic to the

City's argument that it has already incurred significant costs and expenses in order to satisfy other electronic discovery demands of Plaintiffs in this case; however, the majority of those expenses do not directly relate to the restoration and search of the back-up tape which is the issue now before the court and therefore should not be considered.  *Cf. **Zubulake III**,* 217 F.R.D. at 290 (as a general rule, where cost-shifting is appropriate, only the costs of restoration and searching should be shifted).  Because the e-mails are reasonably accessible without undue burden or cost, the cost-shifting factors in the amendment to Rule 26(b)(2)(C) do not come into play.  *Cf, **Zubulake I**,* 217 F.R.D. at 318 (cost-shifting should only be considered when electronic discovery imposes an "undue burden or expense" on the responding party).

Had the direct cost and expense of restoring and searching the back-up tape been larger in this case, as may often be the case with use of back-up tapes, the application of the cost-shifting factors outlined in the amendments to Rule 26(b)(2)(C) and ***Zubulake I*** would have easily supported a shifting of some of the costs to the Plaintiffs.  This is particularly true since it appears to the court that the likelihood that the search of the July 23, 2004, back-up tape would result in the discovery of *significant important evidence* to support Plaintiffs' discrimination claims in this case is somewhat questionable and speculative.  In that regard, the

27

court does note that Defendants apparently have not attempted to view any of the e-mails on the back-up tape even though e-mails for 117 mailboxes have already been transferred to .pst format and could have been searched with Microsoft Outlook search features.  Thus, Defendants, like Plaintiffs, are merely speculating about the results of any e-mail search.[21]

While the court has concluded that cost-shifting is not warranted in this case, the court still retains the authority under Fed.R.Civ.P. 26(b)(2) to limit the extent of proposed discovery where the expense outweighs its likely benefit.  After considering all the fact of this case, the court concludes that the scope of the search of the e-mails should be limited in two respects.

First, the court notes in this case the relative cost to restore and search the requested e-mails is much less because Plaintiffs have agreed that only one back-up tape for July 23, 2004, should be searched.  On the other hand, Plaintiffs' designation of the seventeen words to be used for searches[22] as to each of the 117 supervisors' e-mail boxes appears to be too broad in scope. The court agrees with Defendants that several of the

---

[21]  The court notes that as part of their negotiations concerning the search of the e-mails, the parties could have agreed to run a search of a small "sample" of the 117 supervisors' e-mails by searching the .pst files (which had already been copied by the City) with the Microsoft Outlook search feature.  Use of such a sampling procedure might have assisted the parties and the court in determining the likelihood that the search would disclose important relevant information.  *See e.g.*, ***Zubulake I,*** 217 F.R.D. at 323-34; ***Zubulake III,*** 216 F.R.D. at 282-83.

[22]  *See* Doc. 121 at 3-4.

words are common enough that they might well result in identification of a significant volume of irrelevant e-mail. Others are words that do not appear to be reasonably calculated to lead to the discovery of relevant evidence in this case. Accordingly, the Court finds that the following words should *not* be used in any e-mail search: Sara, Heather, Female, Ho, Kim and Dyke.

Second, while Plaintiffs may be entitled to seek discovery of an alleged department-wide gender bias from supervisors other than those who directly supervise the four Plaintiffs,[23] the court believes that the cost of searching 117 mailboxes exceeds the likely benefit of such a search. Accordingly, any e-mail search shall be limited to on 50 of the 117 identified mailboxes. Plaintiffs may select the 50 mailboxes to be searched.

Because the court has pared down the both the number of words to be used in any search as well as the number of mailboxes to be searched, this will reduce the expenses forecast by Defendants, particularly if they choose to search the .pst files which have already been copied for all 117 supervisors' e-mail boxes. This will not, however, significantly reduce the cost if the City elects to purchase the Discovery Attender software since it searches the entire e-mail back-up file in one operation. Because it has not ordered any shifting of costs to Plaintiffs, the court

---

[23] *See* Note 18, *supra.*

believes that Defendants should retain the right to decide whether to purchase and install the Discovery Attender software or to conduct searches of the .pst files using Microsoft Outlook.

**IT IS THEREFORE ORDERED** that Defendants' motion for Plaintiffs to pay all or part of the costs relating to discovery of Defendants' electronic mail (Doc. 58), is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the search of Defendants' electronic mail shall be limited in scope as set out in this Memorandum and Order**.**

Dated at Wichita, Kansas, on this 15th day of November, 2006.

   s/ Donald W. Bostwick
DONALD W. BOSTWICK
United States Magistrate Judge