IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

GRETA SEMSROTH, et al.,           )
                                  )
                Plaintiffs,       )      **CIVIL ACTION**
                                  )
v.                                )      No. 04-1245-MLB
                                  )
CITY OF WICHITA, et al.,          )
                                  )
                Defendants.       )
_____)

## MEMORANDUM AND ORDER

This matter comes before the court on defendants City of Wichita ("City") and Chief Norman Williams' ("Chief Williams'") motion for summary judgment. (Doc. 154.)  The motion has been fully briefed and is ripe for decision.  (Docs. 155, 162, 166, 169[1], 172.)  The motion is GRANTED for the reasons stated herein.

Prior to filing the motion for summary judgment now before the court, defendants also filed motions to strike plaintiffs' two expert witnesses.  (Docs. 137, 138, 139, 140, 144, 150 151.)  Because of the court's ruling on the motion for summary judgment, the motions to strike plaintiffs' expert witnesses are now moot.

This employment discrimination case was filed as a class action on July 28, 2004.  (Doc. 1.)  The case has undergone significant

_____

[1]  In response to a letter from the Court outlining plaintiffs' noncompliance with the D. Kan. Local Rules for responding to statements of uncontroverted facts in motions for summary judgment (Doc. 168), plaintiffs filed a "corrected response to Defendants' motion for summary judgment" (Doc. 169).  It is this corrected response that the court used in analyzing defendants' motion for summary judgment.  As stated in the court's recitation of the facts, despite the opportunity for correction, plaintiffs failed in various ways to comply with the rules governing motions for summary judgment and responses and replies thereto.

manipulations since its original filing.  In October 2004, the court granted defendants' motion to dismiss: 1) claims against Chief Williams in his official capacity; 2) claims against the Wichita Police Department; 3) plaintiffs' claim of deprivation of their liberty interest in reputation; and 4) all state tort claims.  (Doc. 31.)  In March 2005, plaintiffs amended their complaint to drop claims brought under Kansas' Equal Pay Act and § 1983 for right to privacy/association violations.  (Docs. 51, 53.)

In September 2005, the court denied plaintiffs' motion for class certification, finding that a class claim had not been exhausted.  (Doc. 86.)  As a result, plaintiff Plush's Title VII claims were dismissed for failure to exhaust, in October 2005.  (Doc. 92.)  In September 2006, plaintiffs were denied leave to file a second amended complaint that would have alleged purportedly exhausted class claims and retaliation claims.  (Doc. 118.)  After this denial, plaintiffs subsequently filed the proposed second amended complaint in another court within this district.  See Semsroth, et al. v. City of Wichita, et al., No. 06-02376-KHV-DJW (filed Sept. 7, 2006).

Finally, in January 2007, the court filed its pretrial order.  (Doc. 142.)  The pretrial order states three claims: 1) a violation of Title VII, 42 U.S.C. § 2000e, et seq., brought by plaintiffs Semsroth, Voyles and Warehime against the City (alleging disparate treatment, hostile work environment, retaliation, a pattern and practice of disparate treatment, and disparate impact); 2) a violation of 42 U.S.C. § 1983 brought by all plaintiffs against Chief Williams in his personal capacity; and 3) a violation of 42 U.S.C. § 1985 brought by all plaintiffs against Chief Williams.  (Doc. 142 at 31.)

-2-

In their response to defendants motion for summary judgment, plaintiffs abandon their claim brought pursuant to § 1985. (Doc. 162 at 34 n.9.) Therefore, only the three plaintiffs' Title VII claims against the City and the four plaintiffs' § 1983 claims against Chief Williams remain. The City and Chief Williams move for summary judgment on all claims. (Doc. 154 at 2.)

## I. MOTION FOR SUMMARY JUDGMENT STANDARDS

The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted); see also Adams v. Am. Guarantee & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (citing Adler). The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment because the factual dispute must be material. See Renfro v. City of Emporia, 948 F.2d 1529, 1533 (10th Cir. 1991).

A defendant initially must show both an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Adler, 144 F.3d at 670. Because a plaintiff bears the burden of

proof at trial, a defendant need not "support [its] motion with affidavits or other similar materials <u>negating</u> [a plaintiff's]" claims or defenses.  <u>Celotex</u>, 477 U.S. at 323 (emphasis in original). Rather, a defendant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of a plaintiff's claim. See <u>Adler</u>, 144 F.3d at 671 (citing <u>Celotex</u>, 477 U.S. at 325).

If the defendant properly supports its motion, the burden then shifts to the plaintiff, who may not rest upon the mere allegation or denials of its pleading, but must set forth specific facts showing that there is a genuine issue for trial.  See <u>Mitchell v. City of Moore, Okla.</u>, 218 F.3d 1190, 1197-98 (10th Cir. 2000).  In setting forward these specific facts, the plaintiff must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." <u>Adler</u>, 144 F.3d at 671.  If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. See <u>Cone v. Longmont United Hosp. Ass'n</u>, 14 F.3d 526, 533 (10th Cir. 1994).  A plaintiff "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." <u>Conaway v. Smith</u>, 853 F.2d 789, 793 (10th Cir. 1988).  Put simply, the plaintiff must "do more than simply show there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

Certain local rules further govern the presentation of facts and evidence.  Local Rule 56.1 requires the movant to set forth a concise statement of material facts.  D. Kan. Rule 56.1.  Each fact must

appear in a separately numbered paragraph and each paragraph must refer with particularity to the portion of the record upon which the defendant relies.  See id.  The opposing memorandum must contain a similar statement of facts.  The plaintiff must number each fact in dispute, refer with particularity to those portions of the record upon which he or she relies and, if applicable, state the number of the defendant's fact that he or she disputes.  The court may, but is not obligated to, search for and consider evidence in the record that would rebut the defendant's evidence, but that the plaintiff has failed to cite.  See Mitchell, 218 F.3d at 1199; Adler, 144 F.3d at 672.  All material facts set forth in the statement of the defendant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the plaintiff.  See id.; Gullickson v. Sw. Airlines Pilots' Ass'n, 87 F.3d 1176, 1183 (10th Cir. 1996) (applying local rules of District of Utah).  A standing order of this court also precludes drawing inferences or making arguments within the statement of facts.

The parties need not present evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.  See Thomas v. Int'l Bus. Machs., 48 F.3d 478, 485 (10th Cir. 1995) (internal quotations and citations omitted).  For example, hearsay testimony that would be inadmissible at trial may not be included.  See Adams, 233 F.3d at 1246.  Similarly, the court will disregard conclusory statements and statements not based on personal knowledge. See Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1382 (10th Cir. 1994) (regarding conclusory statements); Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995) (requiring personal

knowledge).  Finally, the court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e).  See FED. R. CIV. P. 56(e); D. Kan. Rule 56.1; 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2722 (2d ed. 1983) (footnotes omitted).

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If sufficient evidence exists on which a trier of fact could reasonably find for the plaintiff, summary judgment is inappropriate. See Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

## II.  FACTS

All facts set forth are either uncontroverted, or, if controverted, taken in the light most favorable, along with all favorable inferences, to plaintiffs. See Adler, 144 F.3d at 670.  To the extent relevant, the factual disagreements between the parties will be noted.

Statements made in either parties' memoranda that are not supported with citations to the record have not been included in the court's recitation of the facts. See D. Kan. Local R. 7.6 ("Each statement of fact should be supported by reference to the record in the case."); 56.1(a) ("facts . . . shall refer with particularity to

those portions of the record upon which the movant relies"); 56.1(b) (same requirement for opposing memorandum). The parties' memoranda also contain many statements followed by a record citation, but the record citation does not support the statement made. Because these statements are unsupported, they are also not included in the court's recitation of the facts.

In addition, statements made in the parties' memoranda that are supported only by reference to an unauthenticated exhibit have not been included in the recitation of facts. <u>See</u> D. Kan. Local R. 56.1(d) ("All facts on which a motion or opposition is based shall be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answer to interrogatories and responses to requests for admissions."). However, statements supported by an unauthenticated exhibit whose admissibility has been stipulated to have been included. <u>See</u> Doc. 142 at 4 (parties' stipulations to the admissibility of "Personnel records of plaintiffs produced during this litigation," "Discipline records of plaintiffs produced during this litigation," "Diversity Reports: 2000-Quarterly Reports (First through Fourth)," and the "WPD Policy and Procedure Manual.").

The court also has not included in its factual consideration the parties' statements that are supported by citation to inadmissible hearsay. <u>See</u> <u>Adams</u>, 233 F.3d at 1246 (stating that hearsay testimony that would be inadmissible at trial may not be considered). The court has not included statements that are irrelevant to the analysis at hand. <u>See</u> <u>Adler</u>, 144 F.3d at 670 ("[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the

claim."). One example, of many, is that plaintiffs make no claim with respect to hiring, so statements propounded about the statistical relationships with regard to hiring were not included. Other irrelevant statements of fact are those regarding pay, the numbers of females in supervisory positions or on the SWAT team, explosive ordinance disposal unit, or motorcycle unit, the levels of awards within the WPD, and termination, as plaintiffs make no claims in these regards.

Further, plaintiffs make multiple statements which are allegedly supported by citation to the report of one of their propounded experts, Penny Harrington. However, the court cannot determine the manner of plaintiffs citation to Harrington's report. For example, plaintiffs cite to "Harrington Rep. at 94" but the court's copy of the report is numbered 1 through 53, then 1 through 49, and then 1 through 8. The court's electronic filing system numbers the report 1 through 22, then 1 through 22 a second time, then 1 through 22 a third time, then 1 through 10, then 1 through 12, and finally 1 through 22. Thus, the court cannot determine the portion of the report plaintiffs are citing to. As a result, these propounded statements are unsupported and not included.

Finally, as a result of the court's standing order, the argument of the parties that is included within the parties factual statements was wholly ignored. _See_ Revised Standing Order, _available at_ http://www.ksd.circ10.dcn/chambers/showjudge.php?juegeid=13 (click on "Standing Order"), at ¶ 1.E. ("Statements of uncontroverted fact shall cite _only_ facts. Responses to statements of uncontroverted fact shall cite _only_ controverting facts. Argument and the drawing of inferences

-8-

shall be reserved for the authorities and argument section of the memorandum.").

## A.  General Factual Background

All plaintiffs are female, and either are or have been commissioned police officers with the Wichita Police Department ("WPD").  Plaintiffs, while employed by the WPD, were qualified to perform the functions of a commissioned police officer.  Chief Williams has been the chief of police of the WPD since April 12, 2000 and is responsible for managing the WPD.

### 1.  The Work Assignments of Officers

Officers at the WPD do not get to pick their assignments within the WPD.  It is not unusual to be denied a request for a specific "beat" assignment.  Beat assignments are not made based on seniority or disciplinary history and there is no difference in the hourly rate of pay for officers on different beats.  Beat assignments are made based on supervisors' determinations on how best to serve the community.

Changes in the assignments of officers, such as to a different "substation," shift, beat within a patrol, or to "Badge on the Floor" do not affect the pay, rank, or status of a police officer. Assignments to community policing, school resource officer positions, the gang unit, SCAT, the mounted unit, traffic, or to the exploited and missing children's unit also do not affect the pay, rank, or status of a police officer.  An assignment as a school resource officer is not a promotion, but a special assignment.  Officers who have had special assignments do not receive extra credit for that experience in the promotion process.  Chief Williams is not involved

-9-

in the assignment of officers to different beats, or to assignments as community policing/beat coordinator, school resource officer, or traffic.

In addition, the WPD does not have a policy or practice of allowing officers to choose their light-duty assignments. Officers on light duty receive the same wages as officers on full duty. Chief Williams is not involved in assigning officers to light-duty work, unless the light-duty assignment involves a change in division. In situations where a light-duty assignment involves a change in divisions, deputy chiefs identify the light-duty assignment and request that Chief Williams issue a special order to effectuate the assignment.

Chief Williams is not generally involved in selecting which officers may attend training or scheduling of training. Chief Williams is only involved in training decisions when he orders a specific officer to obtain training, orders specific training for a large group of employees, or approves budget expenses for out of town training.

To become eligible to apply for promotions, officers must meet certain educational requirements. When making decisions on promotions, a list of the top twenty-five percent of the candidates is compiled. Chief Williams then selects from any of the candidates from that top twenty-five percent. Chief Williams' decision can be reviewed by personnel, but the review is only to ensure compliance with the top twenty-five percent requirement. Chief Williams' decision has never been reversed. Chief Williams encourages female officers, and all officers, through personal communications, to apply

for promotions.

### 2.  WPD Policies and Regulations

WPD policy 207 prohibits discrimination, sexual harassment, and retaliation.  In addition, the City has had policies prohibiting sexual harassment and discrimination for many years.  These policies provide: 1) multiple ways to make a complaint regarding sexual harassment and discrimination; 2) an investigation process; and 3) discipline.  The policy against discrimination against women refers to the department's equal employment opportunity officer and the affirmative action administrator.

The City also has a policy regarding the Family Medical Leave Act ("FMLA").  The City's FMLA policy permits the employee to choose whether to use sick leave or to go into without-pay status under FMLA. The FMLA policy provides for adjustments to seniority and advancement if unpaid leave is taken.  FMLA leave is available to men and it is applied the same to men and women.  The City does not have a maternity leave policy.

The WPD has additional policies regarding officer behavior. These regulations provide:

> 3.405 (A) Members of the Department shall avoid any derogatory criticism, idle conversation, or gossip.
>
> 3.911 (C) While on-duty, commissioned officers shall take appropriate police action whenever necessary, and shall make a written report of such action [exception to making a written report: see Regulation 5.801]
>
> 5.801 (B) Members of the Department who receive designated calls for service from the dispatcher will document the handling and disposition of such calls by one of two methods only:

> 1.   Obtaining an incident number and completing an Incident Report, or;
>
> 2.   When allowed by policy, advising the dispatcher of the appropriate N-Code.
>
> 5.802 (B) Members of the Department who witness a police incident or who are contacted directly by a citizen who reports a police incident, shall document the handling and disposition of such incidents by obtaining an incident number and completing an Incident Report.  For purposes of this section, a police incident is any situation which could not be disposed of, in the reporting sense, by utilization of an appropriate N-Code.

There is no rule or regulation prohibiting playing a prank or joking with another officer.  An officer may be disciplined, however, if by playing a prank or a joke they violate a rule or regulation.  The WPD investigates off-duty behavior.

### 3.   The Disciplinary Process

Another WPD regulation provides for a matrix of discipline within the WPD based on the regulation violated.  Each regulation has a penalty code (e.g., "A", "B", or "C") associated with it, which dictates the type of discipline to be imposed for the violation of that regulation.  The penalty codes and associated discipline are:

| PENALTY CODE | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE |
| --- | --- | --- | --- |
| A | Verbal warning to reprimand | Reprimand to 3 days suspension | 1 to 5 days suspension |
| B | Reprimand to 3 days suspension | 1 to 5 days suspension | 3 to 15 days suspension |
| C | 1 to 5 days suspension | 3 to 15 days suspension | 5 to 30 days suspension to dismissal |
| D | 1 to 15 days suspension | 5 to 30 days suspension to dismissal | 15 to 30 days suspension to dismissal |

| E | 15 days suspension to dismissal | Dismissal | – |
| F | Dismissal | – | – |

Chief Williams has the final authority as to what discipline an officer receives.  Review of violations A through C are entrusted to the field sergeants, lieutenants, and captains.  Violations ranked D through F are to be reported to the professional standards committee.  WPD policy requires supervisors to initiate investigations of misconduct.[2]  WPD regulations allow Chief Williams to deviate from the disciplinary penalty policy.

Chief Williams did not discuss or make plans to find out negative information or to discredit Semsroth, Voyles, Warehime, or Plush.  Chief Williams did not tell others to obtain such information.  Chief Williams does not complete the evaluations of officers and does not meet with officers unless there is a grievance or possible problem with an officer's evaluation that is brought to his attention.

---

[2] Plaintiffs' additional statement of fact number three states, in part: "If a supervisor does not find actions offensive and chooses not to report the incident, there will be no records of whether such violation has occurred. (Wiley Dep. 23:22-24)."  The cited deposition testimony does not support this statement.

Following a description of how disciplinary reports move through the chain of command, the deponent, sergeant Wiley, is then asked if he can remember a time that he forwarded a complaint to his superior but it was never moved up the chain of command.  The cited portion of the transcript states only: "Q.  Which incidents – how many instances can you recall sitting here today?  A.  There's three incidents that come to mind.  There may have been more."

Obviously, the cited transcript portion, even looked at with an expansive view, does not support the statement made by plaintiffs, either directly or by inference.  Sergeant Wiley does not discuss the implications of a supervisor finding something not offensive or the records that are made of incidents.

This is one example, of many, in which plaintiffs' citations do not support the facts they are trying to establish.

-13-

### 4.  Miscellaneous Testimony

Sergeant Wiley[3] testified that the WPD could be characterized as a "good-ol' boy" network, that the majority of white males are included in this good ol' boy network, and that females are not normally part of this network.  Sergeant Wiley also testified that in the past five years he has seen or heard about some unacceptable posters or fliers that were sexual in nature.  He stated that he has heard individuals in supervisory positions use the words "bitch," "whore," and "ho" but he could not give a time frame for when he heard these words used.  Sergeant Wiley testified that he has heard the word "whore" or "ho" said in the presence of female officers and that he had heard stereotypical statements by officers and supervisors made about lesbian female officers, including the use of slurs.  Sergeant Wiley testified that officers and supervisors make comments about female employee's breasts or buttocks or attractiveness and that, in his experience, female officers are not treated equally by their male counterparts.  He has heard male employees state that they do not want a female backing them.  Sergeant Wiley explained that an officer's supervisor evaluates that officer and is also the person to whom the officer would make a complaint about harassment.  Sergeant Wiley testified that a grievance procedure is available to officers who believe their evaluation was unfair but that usually the evaluation is "written in concrete" when it is completed.  Sergeant Wiley stated

---

[3]  Plaintiffs propound the following paragraph of facts about sergeant Wiley but never establish how he is related to any individual plaintiff or the time frame his testimony covers.  Defendants note that sergeant Wiley has been with the WPD since 1977.  As a result, it is difficult to determine the relevancy of sergeant Wiley's testimony.

that when female officers make complaints about their male counterparts, they are treated differently and avoided by their male counterparts.

Terri Moses is a deputy chief of the WPD. Deputy chief Moses testified that she had heard male employees make stereotypical comments about female officers, but she cannot remember any specific examples. Because there are not many women in the WPD, it can sometimes make the WPD more difficult for women. She is concerned about the rate women leave the police force.

**B.   Officer Greta Semsroth ("Semsroth")[4]**

Semsroth graduated from the Wichita Police Department's Training Academy in September 2000. On September 30, 2000, she began 14 weeks of field training. Semsroth has held the position of police officer since that time. Semsroth testified that she believes evaluations and the granting of merit awards are done subjectively and that this subjectivity discouraged her from promotions. Semsroth has never applied for a promotion.

Semsroth's allegations begin in 2000. In 2000, Semsroth alleges that officer Kilts sexually assaulted her. In a separate incident in 2000, Semsroth states that officer Kilts asked her for a date and came to her house and beat on the doors and windows while in uniform. Officer Kilts left when she told him to leave the property, although with some hesitancy. Semsroth never reported the alleged sexual

---

[4] The court refers to the individual plaintiffs with their last name only (i.e., they are not identified by their rank within the WPD) for ease of readability. Other employees of the WPD are identified with their rank because it is necessary in establishing the relationship among the employees and the plaintiffs (i.e., supervisor status versus a fellow officer).

assault by officer Kilts, never complained about officer Kilts, and does not know of anyone in the WPD who was aware of what happened. Officer Kilts was Semsroth's field training supervisor at the time.

Semsroth is aware of the City's policy against discrimination against women and reviewed WPD policy 207 as a recruit.  At her deposition, Semsroth testified that she had not experienced "sexual harassment," but, rather, had heard things that were "inappropriate." Semsroth has heard of male officers making comments about female officer's breasts.  At some point, officer Bartel said Semsroth was "hot" and sergeant Kennedy made comments about Semsroth being blonde and dumb.  Semsroth was not offended by either of these incidents, but she found them "inappropriate" and "annoying."  Semsroth has not directly heard any male officers refer to female officers as bitches, but was told by a supervisor, lieutenant Hanley, that some male officers thought she was a bitch and that she should let her hair down and go out and have beers with the guys.  Semsroth has heard a lieutenant refer to a female victim of a rape crime as a "whore." Semsroth testified that she believes there is a negative attitude towards women in the WPD.

At some point, Semsroth thought sergeant Chambers had followed her.  Semsroth spoke to captain Allred about this and he "looked into it."  Allred, after learning the facts, verbally counseled Semsroth about Semsroth not going to lunch during the first hour of her shift, the reason for sergeant Chambers following her.  Semsroth admits that sergeants and lieutenants have a right or obligation, depending on the circumstances, to know where their officers are.

Semsroth testified that she believes she was passed over for an

-16-

award regarding a suspicious character call that was later determined to be a conspiracy to commit robbery. Semsroth also testified that she had been denied support during emergency calls several times over the course of her career. In describing one example, however, Semsroth stated that she was not denied assistance during the emergency call itself.

On June 3, 2002, eighty-six WPD officers were involved in a shooting that occurred at the English Village Inn. Ten of these officers were female. (Of the original officers on the scene, Semsroth was the only female.) Officers who were involved in gunfire with the suspect in the incident received awards. Semsroth filed a report of her involvement at the English Village Inn. A fellow male officer who received an award had ridden with Semsroth to the scene but was more directly involved in the incident (he arrived at the scene with Semsroth but later also exchanged gunfire with the suspect). Eight male officers received awards for the June 3, 2002 incident.

In April 2003, Semsroth found in her locker photos of an award and a sticky note stating that Semsroth should cut out the award and pin it to her uniform because that would be the closest she would get to a real award. Semsroth was visibly upset by the photo and note and complained to sergeant Chambers about the photo and note. Sergeant Chambers and captain Tabor told Semsroth they would investigate who put the photo in her locker. After their investigation, sergeant Chambers and captain Tabor made officer Tucker apologize to Semsroth. Officer Tucker was verbally counseled and a notation of the incident was made in officer Tucker's performance file. A formal investigation

-17-

by the WPD Professional Standards Committee was not undertaken with regard to this incident.

At some point prior to October 2003, a fellow officer, Officer Byers, showed Semsroth the shaved areas of his genitals. Semsroth did not report this incident with Officer Byers. In October 2003, Semsroth felt that officer Nixon, a male officer, did not back her on a call. Semsroth complained to sergeant Watts about this incident who told Semsroth that it was just "Nixon being Nixon" and that he would talk to officer Nixon but that he did not want officer Nixon to take it the wrong way. Sergeant Watts initially told Semsroth that officer Nixon should have backed her. Sergeant Watts then spoke to officer Nixon about the incident and investigated the matter. After his investigation, sergeant Watts did not think Nixon had acted inappropriately in not providing backup to Semsroth. After Semsroth spoke to sergeant Watts, she had no subsequent problems with officer Nixon.

Over the course of 2003, Semsroth made complaints to captain Tabor, sergeant Chambers, sergeant Watts, and lieutenant Hanley regarding unfair discipline of officer Plush, recognitions for females, beat assignments, specialty team units, unfair disciplinary practices, and her evaluation. Semsroth also complained to captain Tabor about the reference to her having made an EEO complaint in her evaluation (discussed infra), which was not accurate.

Deputy chief Stolz referred Semsroth to Susan Leiker, the affirmative action administrator in personnel. Stolz told Semsroth not to quit, that if she had any problems she should come talk to him and he could move her and that any problem that was complained of

-18-

would have an investigation completed within thirty days. Deputy chief Stolz also told Semsroth, however, that investigated officers would be exonerated within thirty days. He asked Semsroth for a written complaint or something in writing, but was never given anything in writing by Semsroth. A mutual agreement with a lieutenant (Semsroth does not recall which lieutenant) at the WPD caused Semsroth to meet with Leiker. Semsroth first met with Leiker on October 27, 2003.

Over the course of her conversations with Leiker, Semsroth told Leiker about her transfer to beat 39 (discussed _infra_) and about "incidents that had been happening," including the issue of recognition and the incident where she was told other officers thought she was a bitch. Semsroth verbally made complaints to Leiker, but never filed a written complaint with Leiker because she was afraid of the treatment she would receive at the department if she did so. Semsroth also informed Leiker that she felt retaliation for her visits to Leiker and Leiker informed deputy chief Stolz, deputy chief Lee, captain Gary Tabor and Sergeant Darren Chambers that Semsroth should be assured that no retaliation would be taken. Leiker also informed Stolz, Lee, Tabor, and Chambers that Semsroth had not yet made a complaint, despite having had several conversations with Leiker. Deputy chief Stolz told Leiker that after several meetings they should know whether there was a complaint and that if Semsroth did not make a complaint at the next meeting, she needed to return to work.

Semsroth testified that, at some point after she made complaints about females not being treated the same, she was no longer offered the opportunity to teach training sessions. Semsroth stated that she

was also denied the opportunity for continuing education hours, although she was granted the hours necessary to complete the forty hours per year that are required. Semsroth does not know of any male officer that received more than forty hours of continuing education per year.

In December 2003, Semsroth was transferred to beat 39. Beat 39 is referred to internally at the WPD as a "banishment beat." A banishment beat is a beat on the outer edge of the city that covers a large, but less populated, space. Therefore, there are fewer calls on these beats and the officers assigned to these beats are often called to help on other beats. Sergeant Wiley testified that officers are assigned to banishment beats to keep them out of problems. Semsroth stated that new officers and officers for disciplinary reasons are assigned to banishment beats. Sergeant Wiley explained that an assignment to a banishment beat could have a negative impact on an officer's career advancement because it offered less opportunity for involvement in high profile calls.

Sergeant Watts characterized Semsroth's transfer to beat 39 as "bad news" when he told her about it. Semsroth was told that her transfer to beat 39 was because of turmoil with other male officers, not for disciplinary reasons. Semsroth was not told that her transfer to beat 39 was because she had talked to Leiker. Sergeant Wiley (not Semsroth's direct superior) confirmed that part of the reason Semsroth was transferred to beat 39 was because of personality conflicts with other people on her shift and so that if she was on beat 39 she would be "out there" and would have "nothing to complain about." Sergeant Chambers and sergeant Watts, Semsroth's supervising sergeants at the

-20-

time, stated that they had received complaints from other officers about Semsroth with regard to poor time-management and that this poor time-management was causing animosity with other officers on her beat. Sergeant Chambers explained this was part of the reason for moving Semsroth to beat 39. Semsroth had also complained about other officers' poor time-management on her then-beat before she was transferred to beat 39.

In Semsroth's 2001, 2002, and 2003 evaluations, it was noted that Semsroth had good time-management. However, in her 2003 evaluation, the complaints from Semsroth regarding other officer's time-management, and the complaints about Semsroth from other officers about Semsroth's time management were noted. Semsroth's 2003 evaluation states that "Officer Semsroth has had several conflicts with co-workers on second shift Patrol East. There have been several complaints brought to the attention of supervision from co-workers about her time management skills. As a result of these complaints and statements made to supervision by Officer Semsroth, an EEO complaint was initiated by supervision on her behalf for investigation. The EEO complaint is still under investigation." Semsroth moved out of beat 39 after nine or ten months, in about September 2004. While on beat 39, Semsroth's rate of pay did not change. Semsroth believes, however, that she received less overtime opportunities on beat 39.

On July 28, 2004, Semsroth was offered a change in her assignment. Semsroth declined a transfer because she felt there was no need to transfer if there was going to be a change in the WPD because of the lawsuit. In approximately May 2005, Semsroth applied for a beat coordinator position and was interviewed. Semsroth was

-21-

offered a position at "patrol west" but she turned it down.  Semsroth
also turned down beat coordinator positions at "patrol east," "patrol
north," and "patrol south."

Semsroth objects to Chief Williams because he is the chief of the
WPD and Semsroth believes that discrimination, hostile work
environments, and retaliation happen at the WPD.  Semsroth has never
heard Chief Williams make a sexist or sexual remark.  Semsroth has
never requested to meet with Chief Williams and Chief Williams has
never refused to meet with Semsroth.  Chief Williams took no
retaliatory action against Semsroth for filing her lawsuit or for
talking with Leiker.

Semsroth filed an intake questionnaire with the Equal Employment
Opportunity Commission ("EEOC") on March 11, 2004.  In her EEOC
questionnaire, Semsroth described: 1) not receiving an award in 2001-
2002; 2) the photo and note in her locker; 3) supervisors telling her
in October 2003 that her co-workers called her a bitch and complained
that she was milking calls yet those supervisors did not discipline
the co-workers; 4) not receiving backup on October 13, 2003; 5) a
lieutenant's referral on October 20, 2003 to an equal employment
opportunity representative; 6) investigation about a women's luncheon
on October 21, 2003; 7) a move in beats; 8) notes being made in her
employment file after the City was contacted by Semsroth's attorney;
and 9) being ignored about an EEOC poster.  In her description of the
harm she experienced, Semsroth wrote: "I have been experiencing
discrimination based on my gender for an extended period of time and
when I tried to rectify it with the department they retaliated against
me."  In her description of the last date of the harm she experienced,

Semsroth wrote: "Continuous and ongoing discrimination and retaliation for the claim."  In response to the question "What reason(s) did the employer state for the harm you experienced?", Semsroth wrote: "No one at the department has ever acknowledged that any discrimination has occurred."

Semsroth filed a charge with the Kansas Human Rights Commission ("KHRC") on May 21, 2004.  In her KHRC charge, Semsroth described: 1) grievances that were filed with her supervisor, but nothing was done to resolve the issue; 2) the photo and note in her locker; 3) derogatory gender comments; 4) a change in beats; and 5) denial of backup.  Semsroth related to the KHRC that these events occurred from October 2001 to November 2003.[5]  On the KHRC charge, Semsroth alleged violations of Kansas Act Against Discrimination based on sex and retaliation.

## C.  Officer Sara Voyles ("Voyles")

Voyles graduated from the Wichita Police Department's Training Academy in December 1999.  On December 11, 1999, she began 14 weeks of field training.  Voyles has held the position of police officer since that time.

As a recruit, Voyles read the City's administrative regulation against sexual harassment and reviewed WPD policy 207.  Voyles does not know of any complaints by female officers that were not investigated by the WPD.  Voyles has heard co-employees at the WPD

---

[5] Defendants' statement of uncontroverted fact, which plaintiffs agree is uncontroverted, actually states the dates from the KHRC charge as "between October 2000 to at least November 2003."  (Doc. 155 at 2 ¶ 3.)  This is an obvious misstatement, however, as the KHRC charge states the "alleged date of incident" as "on or about October 2001, to November 22, 2003."  (Doc. 85 Exh. 2.)

refer to female officers as "dykes," but this was not done by supervisors and Voyles cannot recall a specific date. Voyles also testified that at some point, she was directed to a safe post during an emergency call by her male supervisor, sergeant Hoover. Male officers then took over the call.

Approximately three to three and a half years after joining the WPD, in about 2002, Voyles applied for an assignment to the SCAT unit. Voyles believes a male officer, Matthew Little, was given this assignment rather than Voyles. The City responds that the assignment officer Little was given was after the time frame in which Voyles applied. Between January 2000 and January 2006, one female of 120 appointments was assigned to the SCAT team.

On May 4, 2002, Voyles applied for an assignment to the exploited and missing children unit. Officer Bauman was granted this assignment instead of Voyles. On June 15, 2002, Voyles requested an assignment to the exploited and missing children unit. On June 24, 2002, Voyles applied for an assignment to the mounted unit. Male officers Beck, Cundiff, Naldoza, and Woodard received the assignments. Voyles also applied for assignment to the mounted unit in March 2005. Male officers Boal, Cates, and Werts received the assignment instead of Voyles. Since January 2000, two females have been assigned to the mounted unit.

On December 2, 2002, Voyles received a one-day suspension as discipline for violating WPD regulation 3.911(C) because of an incident occurring in September 2002 where she failed to file a report. A violation of WPD regulation 3.911(C) requires a minimum one to five day suspension. Voyles did not file a grievance challenging

-24-

this discipline.   Since 1997, the following male officers were disciplined for violating WPD 5.802 (a different regulation that WPD regulation 3.911(C) but one which governs similar conduct): Estrada, Russel, Wagner, Medina, Alton, Janssen, Tate, Knowles, Teague, and Guliver.  The officers were disciplined either with counseling, verbal counseling, a resignation while under investigation, or a written reprimand.  Voyles feels her December 2002 evaluation is more harsh than male evaluations based on officers' attendance at community meetings.

Voyles took FMLA leave in 2003 due to her pregnancy.  She read the City's FMLA policy in 2003 and it was continuously available to her in the City's policies manual.  Prior to taking FMLA leave, Voyles had the option of using her sick leave or saving it.  Voyles took eight weeks of FMLA leave and saved her sick leave.  Voyles did use all of her vacation time.  When Voyles used her FMLA leave she was in without-pay status.  She was not disciplined for going without pay, but her raise was deferred from December 2004 to February 2005 because of her without-pay status.

In 2003, Voyles was also assigned to light duty during her pregnancy.  Lieutenant Bohannon made comments to Voyles about Voyles' weight and eating habits during her pregnancy.  In December 2003, Voyles spoke with deputy chief Stoltz about lieutenant Bohannon's comments.  Deputy chief Stoltz told Voyles that it was "kind of how Bohannon was" and that she could file a complaint about lieutenant Bohannon.  Voyles did not file a complaint.  Deputy chief Stoltz did have captain Haynes speak with lieutenant Bohannon about lieutenant Bohannon's comments to Voyles.

-25-

Voyles testified that she had not been retaliated against for complaining about discrimination.  However, Voyles stated that when deputy chief Stoltz was made aware of the lawsuit she had filed (through a demand letter), she was moved from her light duty position with the gang unit to a light duty position in the records department. Voyles was told this move was to keep her from working near the lieutenant she complained about.  While in this second light-duty assignment, Voyles worked with others who were placed on the same light duty assignment, although they were placed there as a result of discipline.

Voyles stated she was given an "oral reprimand" when media was present.  However, at her deposition, Voyles testified she was not disciplined.  Voyles heard lieutenant Bohannon speaking on the telephone and he said Voyles was "being difficult."  When this occurred, the media was next to her in an open room having a daily briefing.  Voyles did not know if the media heard lieutenant Bohannon. Voyles did not establish the date of this occurrence, but it had to have occurred while she was assigned to light duty working with lieutenant Bohannon, during her pregnancy in approximately 2003.

At some point, in approximately 2005, Voyles applied for drug recognition expert training on two separate occasions.  On her second application for the training, Voyles was not contacted by the department with a response.  A male officer, officer Oblinger was selected to attend the training rather than Voyles because officer Oblinger had made 40 DUI arrests in the last year compared to Voyles' zero DUI arrests.

Voyles has never spoken with Chief Williams about any sexism

-26-

issues or discrimination.  Voyles testified that she believed Chief Williams was included in the lawsuit because he was the head of the department and was responsible for what happened in the department.

Voyles filed an intake questionnaire with the EEOC on March 18, 2004.  In her EEOC questionnaire, Voyles described: 1) being exposed to incidents of harassment with one example of a male officer asking Voyles if she was "enjoying herself" during a stop of a naked suspect; 2) comments from lieutenant Bohannon and an oral reprimand from lieutenant Bohannon with media nearby; 3) a reprimand for comments on a questionnaire; 4) an assignment to desk work in October 2001 for not writing enough tickets; and 5) disparate treatment on her 2002 evaluation.  Voyles' intake questionnaire mimicked Semsroth's questionnaire in all other respects.  In her description of the harm she experienced, Voyles wrote:  "I have been experiencing discrimination based on my gender for an extended period of time and when I tried to rectify it with the department they retaliated against me."  In her description of the last date of the harm she experienced, Voyles wrote: "Continuous and ongoing discrimination and retaliation for the claim."  In response to the question "What reason(s) did the employer state for the harm you experienced?", Voyles wrote: "No one at the department has ever acknowledged that any discrimination has occurred."   Both of these responses are identical to those of Semsroth.

**D.  Officer Kim Warehime ("Warehime")**

Warehime graduated from the Wichita Police Department's Training Academy in June 1996.  On June 22, 1996, she began 14 weeks of field training.  Warehime has held the position of police officer since that

time.  At some point, Warehime applied for a detective position.  She applied for a detective position only one time.

Warehime was assigned to beat 39 in 1996.  Warehime felt that there is not a lot of activity on beat 39 and an officer has little opportunity for gaining experience.  Warehime also testified, however, that her lieutenant told her the biggest drug busts happen on beat 39 and that, at some point in her time with the WPD, she asked to be put back on beat 39 because of its location.

Warehime, as a recruit, was aware that the City has a policy against sexual harassment and discrimination.  Warehime also had a class covering the sexual harassment policy of the City.  Warehime could not recall any statements made by male officers about women's bodies.  Warehime has heard "other people" make comments about her short stature.  She has heard other officers refer to female victims of rape as "whores," but she cannot remember when these instances occurred or who specifically was involved.  Warehime testified that supervisors "giggle[d] along with it" when this happened.  Warehime also testified that other officers have said to her that female officers would get their butts kicked if they were engaged in physical combat.  Warehime has heard "other people" comment about her ability to "back" them, but she could not recall when this happened or the individuals involved, just that it has happened on and off since 1996.

At some point, Warehime was on a call with two male officers, officers Tiday and Richardson, when the male officers left the scene without informing Warehime.  Warehime was still at the scene gathering information from individuals with mental health problems for the preparation of a police report.

-28-

In 2001, officer Kilts exposed himself to Warehime, who reported this incident to her supervisors. Warehime also reported that officer Kilts told her he had raped a woman. Warehime was told by a fellow officer that other officers did not trust Warehime after she reported these incidents.

At some point, Warehime became aware of a meeting of female officers about getting a maternity leave policy. Warehime, however, did not attend the meeting and does not know when it was held. Lieutenant Loftis asked Warehime if she had been to a meeting about discrimination. Warehime replied that she had not been invited, so she did not go to the meeting. Warehime then stated that the meeting was about maternity issues, not discrimination, and left the room.

Several times, Warehime applied for school resource officer positions. Warehime felt she was discouraged from applying for one position because the supervisor would prefer to have Warehime as a middle school officer rather than a high school officer. The assignment was given to a male officer, officer Russell. A second position was given to a male officer with more seniority and previous experience as a school resource officer, officer Lacy. Warehime was given the assignment of school resource officer for the 2004-2005 year and was the first female school resource officer.

In October 2003, Warehime had a conversation with captain Tabor regarding a "hostile work environment" at patrol east. Warehime told captain Tabor she believed she was being treated differently because of her gender. During this conversation, Warehime was reluctant to give names or tell specifics because she only wanted to tell the story and did not want to get anyone in trouble. Captain Tabor looked into

what he thought was the subject of Warehime's conversation with him and, in his report, found no discrimination.

In January 2004, Warehime was disciplined with a written reprimand by lieutenant Atteberry for gossiping at the station during work hours, and the incident was mentioned in Warehime's evaluation. Warehime admits that she was talking with another male officer at work but disputes that the statements she made were properly classified as "gossip." A male officer, officer Finkeldei was given a written reprimand for violating WPD 3.405 (A) (the WPD regulation prohibiting gossip). This incident was mentioned in his evaluation. Officers Clayton Schuler, Erik Landon, Jason Pfeifer, and Michael Miner have also been investigated for violations of WPD regulation 3.405. The charges of a violation of regulation 3.405 were not sustained so the four were not disciplined. The incident was not mentioned in Officer Miner's evaluation. At some point (after she had been disciplined for gossiping), Warehime turned in a holiday request form to lieutenant Loftis. The document she turned in also had copies attached that referred to diseases. Warehime was not disciplined because of this request form.

At some point after making a hostile work environment complaint, Warehime asked to be transferred from patrol east. (Warehime's transfer request was apparently denied, although this is not established in the record.) Male officers received transfers after making requests: officer Ayres was transferred in August 2003 and officer Boucard was transferred in July 2003. Officer Ayres was transferred from patrol east because he received a six-month detective rotation. After completion of the detective rotation, officer Ayres

was transferred to patrol west because he was the subject of an excessive force investigation at patrol east.  Officer Ayres did not make a complaint of a hostile work environment.  Officer Boucard requested a transfer after he and captain Tabor discussed a personality conflict with deputy chief Stolz.  Officer Boucard was transferred from patrol east on July 5, 2003, several weeks after his request, when an opening at patrol west became available.

In 2005, Warehime had an idea for the development of a gang coalition (separate from the gang unit at the WPD) which she communicated within the WPD.  Warehime then saw an article in the newspaper that the gang unit was developing a similar idea.  Warehime spoke to Leiker about this incident and thereafter spoke with her supervisors about her participation in the gang coalition.  Warehime then became involved with and participated in the coalition.

Warehime is not aware of any derogatory comments made by Chief Williams about female officers.  Warehime has also never spoken with Chief Williams about discrimination or harassment within the department.  Warehime testified that she sued Chief Williams individually because he is responsible for everyone beneath him.

Warehime did not file a complaint of sex discrimination with Leiker or with the WPD equal employment officer because she felt that once she made a complaint she would be labeled.  Approximately one year to six months before filing her lawsuit, Warehime did make at least two appointments with Leiker but she backed out of the appointments.  Leiker called Warehime to urge Warehime to come talk about her problems.  Warehime made verbal complaints to lieutenant Loftis and Leiker.  However, Warehime never filed a written complaint.

Warehime filed an intake questionnaire with the EEOC on March 12, 2004.  In her EEOC questionnaire, Warehime described: 1) questions in a 1999 interview about children, marriage, and day care; 2) the 2001 conversation with officer Kilts and the WPD's failure to reprimand him; 3) discipline on January 5, 2004 for making a comment about an officer having a disease; 4) questions about a lunch in January 2004, and 5) a rotation for a temporary job that she was not offered. Warehime's intake questionnaire mimicked Semsroth's and Voyles' questionnaires in all other respects.  In her description of the harm she experienced, Warehime wrote: "I have been experiencing discrimination based on my gender for an extended period of time and when I tried to rectify it with the department they retaliated against me."  In her description of the last date of the harm she experienced, Warehime wrote: "Continuous and ongoing discrimination and retaliation for the claim."  In response to the question "What reason(s) did the employer state for the harm you experienced?", Warehime wrote: "No one at the department has ever acknowledged that any discrimination has occurred."

## E.  Officer Heather Plush ("Plush")

Plush graduated from the Wichita Police Department's Training Academy in August 2002.  On August 3, 2002, she began 14 weeks of field training.  Plush held the position of police officer from the time of her employment to her resignation on December 21, 2005.  She never applied for a promotion during that time and never applied for a specialty unit.

Plush has heard of officers being disciplined for violating WPD policy 207 but she has not heard supervisors make remarks about the

appearance of female officers.  At some point, a male officer, Officer
Rausch, at an after-work party, told Plush she needed to wear a mini
skirt.

Plush does not believe she was discriminated against with regard
to promotions, work assignments, training, receipt of bonuses,
benefits, or receipt of awards.  Plush later testified, however, that
she believed she did not receive a community policing position (a
position which she testified was given to a male officer with less
seniority) because she had filed her lawsuit.  Also, Plush testified
that at some point, after a call in which force had to be used,
sergeant Hugria spoke with officer Plush and a male officer, officer
Boyd.  Sergeant Hugria asked Plush why she had not drawn her gun but
did not ask officer Boyd the same question.

In February 2004, Plush wrote: "I need a good man.  I need man
love.  Honk if you love men" on officer Tucker's truck windows in
"White-Out."  On July 29, 2004, Chief Williams saw officer Tucker's
vehicle with the writing still on the windows.  Chief Williams told
officer Tucker to make a report about the incident, which officer
Tucker did on July 29, 2004.  After officer Tucker made a report,
Plush was investigated, but no violation was found and Plush was not
disciplined.  Plush was unaware of any male officers who played pranks
but were not investigated.

In May 2004, Plush requested a transfer to patrol west from
patrol east "due to a hostile work environment."  The request was
denied.  A male officer with six months less experience, officer
Davidson was given the assignment.  In June 2004, Plush received a
commendatory performance report for her "diligent effort" identifying

-33-

a suspect in a robbery.  This report was signed by all of Plush's supervisors, including Chief Williams.  Then, in August 2004, Plush was transferred from patrol east to patrol west.  Plush also refers to the transfer requests that were granted to officer Ayres and officer Boucard (discussed supra with regard to officer Warehime).  Plush testified she was informed that officer Ayres was transferred because he was having problems.  Plush testified that Officer Boucard told Plush that if she complained about a hostile work environment they could not keep her at her current patrol, but she does not remember when she had this conversation with officer Boucard.

In 2004, Plush had two different supervisors. WPD policy 215.03A states that when a supervisor has monitored an officer for less than 180 days, the current supervisor must consult with the former supervisor and both supervisors must sign the officer's evaluation. Plush's 2004 evaluation was sent by sergeant Hungria to sergeant Chambers for review before sergeant Hungria presented it to Plush. Sergeant Chambers suggested Plush should be rated as an "M" rather than the "E" rating sergeant Hungria had proposed.  In the WPD's rating system, an "M" rating means the officer meets expectations, while an "E" rating means the officer exceeds expectations.  Plush was ultimately rated as an "E" after discussing her evaluation with lieutenant Bannister.

On August 30, 2004 deputy chief Stolz made a complaint about behavior of Plush occurring in March 2004 where Plush made a rude comment during a squad meeting.  In September 2004, Plush was given a written reprimand for violating WPD regulation 3.207(B).

Deputy chief Stolz also informed Chief Williams that several

reports had been received that Plush had engaged in inappropriate behavior while off duty at a party.  Plush was at an after-hours bachelor party at a strip club and one of the strippers lifted Plush's shirt for less than three seconds.  Plush was not in uniform or otherwise identifiable as an officer.  Deputy chief Stolz and Chief Williams discussed that the reports would need to be investigated and the matter was referred for a professional standards investigation. The investigation was ultimately expanded to include investigation of the behavior of other officers in attendance at the party. Ultimately, Plush was not disciplined for her behavior.  The investigation process did not occur until after the lawsuit was filed, in November 2004.  Both male officers and female officers gave reports of the incident.  Plush testified that she was the only officer investigated "at first" and also testified that she and officer Cornish engaged in the same behavior at the off duty party but she heard that he was not investigated.  No one was disciplined out of this event.

Another officer was involved in a similar-type incident.  Captain Allred was photographed while working off-duty at a hotel.  When the photograph was taken, a woman in the photograph was holding a blow-up penis.  When captain Allred became aware of the photo, he was embarrassed and reported the matter to Chief Williams who counseled Allred to be more aware in the future.

Plush testified that supervisors maintain discretion whether to place disciplinary verbal counseling into an officer's file.  Plush testified that she believed she has received more severe discipline than men for violations of the same policy but gives no examples,

-35-

other than officer Allred.

Plush has not spoken directly to Chief Williams about her concerns.  Plush has heard Chief Williams speak at sex discrimination and harassment training.  Plush stated there was nothing unusual or unsupportive in Chief Williams' demeanor about the policy against harassment and discrimination and Chief Williams encouraged people to make reports of discrimination and harassment.  Plush never made a complaint of discrimination to anyone in the City's personnel office of the WPD's equal employment opportunity office.  Plush did not hear Chief Williams say that a hostile work environment cannot be created in one week.  Plush testified that she does not know why she sued Chief Williams personally but that her concern with Chief Williams is that her allegations have occurred under his supervision.

In March 2005, Plush expressed interest in a community beat team coordinator position.  Plush began community policing the week of Thanksgiving 2005.  Plush resigned from the WPD on December 21, 2005.

## III.  ANALYSIS

## A.  Title VII Claims

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  Plaintiffs[6] allege multiple avenues of recovery pursuant to Title VII against the City: 1) disparate treatment, including discrimination based on unequal discipline, denial of positions and training opportunities, denial of transfer

---

[6] As noted above, the only plaintiffs bringing Title VII claims against the City are Semsroth, Warehime and Voyles.

requests, denial of awards, hostile work environment, retaliation, and a pattern or practice of discrimination; and 2) disparate impact based on excessive subjectivity in promotion, discipline, hiring, and termination.

### 1. Scope of the Claims

Before proceeding to the merits of plaintiffs' claims against the City under Title VII, the court addresses the City's contention that many of the incidents propounded by plaintiffs are not reviewable by this court because they either have not been timely exhausted through the required administrative process, or they were not addressed in the parties' pretrial order.

#### i. Administrative Prerequisites

##### a. Exhaustion

Title VII requires a plaintiff to exhaust her administrative remedies prior to suit. Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir. 2005). A Title VII plaintiff must exhaust administrative remedies for each individual discriminatory or retaliatory act. Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003). "Unexhausted claims involving discrete employment actions" are not viable. Id. at 1210; see also Brown v. Unified Sch. Dist. 501, 465 F.3d 1184, 1186-87 (10th Cir. 2006) ("[E]ach discriminatory act starts a new clock for filing charges alleging that act. Thus, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002))). "Title VII is not intended to allow employees to dredge up old grievances; they must promptly report and take action on

discriminatory acts when they occur. Unlitigated bygones are bygones." Duncan v. Manager, Dep't of Safety, City and County of Denver, 397 F.3d 1300, 1308 (10th Cir. 2005).

### b.  Timely Filing

Title VII requires a plaintiff to file a charge within 300 days of the allegedly discriminatory employment practice, in cases where the plaintiff has initially instituted proceedings with the state agency. 42 U.S.C. § 2000e-5(e)(1). In cases where the plaintiff has not filed a charge with the state agency, Title VII requires a plaintiff to file a charge within 180 days of the allegedly discriminatory conduct. 42 U.S.C. § 2000e-5(e)(1). Kansas is a deferral state where the 300 day time limit applies. See 29 C.F.R. § 1601.80 (designating the Kansas Commission on Civil Rights as a deferral agency); Brown, 465 F.3d at 1186 (recognizing Kansas as a deferral state).

Plaintiffs assert they are entitled to a 300 day "look back" period. (Doc. 169 at 35 ("plaintiffs' actionable claims are limited to 300 days prior to completing their administrative charge.").) Defendants counter that the filing period is extended to 300 days only if "the complainant also files with the state agency" and that, therefore, only Semsroth is entitled to a 300 day window because she is the only plaintiff who filed with the KHRC. (Doc. 172 at 10.)

The court notes that none of the plaintiffs "initially" filed with the KHRC. Semsroth first filed with the EEOC and filed with the KHRC over two months later. Voyles and Warehime did not file with the KHRC at all. Plaintiffs direct the court to 29 C.F.R. § 1601.13(a)(3). Section 1601.13 provides that when deferral agencies

-38-

have waived their right to exclusive processing of claims, a charge filed with the EEOC "is timely if the charge is received within 300 days from the date of the alleged violation." 29 C.F.R. § 1601.13(a)(4)(ii)(A). However, plaintiffs have not proffered any of the procedural facts necessary to establish the applicability of this section.

Regardless, there is legal authority for using plaintiffs' proposed 300 day look back period. See Peterson v. City of Wichita, Kan., 888 F.3d 1307, 1308 (10th Cir. 1989) ("In a deferral state such as Kansas, a Title VII claimant must file his discrimination charge with the appropriate state or local agency, or with the EEOC, within 300 days of the alleged unlawful act."); Smith v. Oral Roberts Evangelistic Ass'n, 731 F.2d 684, 688-90 (10th Cir. 1984) (emphasis added) (holding that a timely filing with a state agency is not required for the 300 day EEOC filing period to apply). To give plaintiffs the benefit of the doubt, the court will apply a 300 day look back period to each plaintiff's claims.

Plaintiffs next assert that the "continuing violation" doctrine allows the court to consider acts of alleged discrimination which occurred prior to the appropriate limitations period for all of plaintiffs claims. The continuing violation doctrine permits consideration of unexhausted incidents of alleged discrimination for hostile work environment claims, as long as "an act" contributing to a hostile work environment took place within the limitations period for filing the EEOC charge. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). For the continuing violation doctrine to apply, however, there must be a relationship between acts alleged after the

-39-

beginning of the filing period and the acts alleged before the filing period.  Duncan, 397 F.3d at 1308-09.  In addition, a court can consider the history of acts comprising the hostile work environment only if the employee did not unreasonably delay the filing of a hostile work environment claim.  Id. at 1308.  To make this determination, a court should look at the type of the acts, the frequency of the acts, and the perpetrator of the acts.  Id. at 1309.

It is clear that the continuing violation doctrine is only applicable to plaintiffs' hostile work environment claim.  See, e.g., Duncan, 397 F.3d at 1309-10 (refusing to apply the continuing violation doctrine when the unexhausted incidents were not part of the same hostile work environment that occurred during the filing period); Annett v. Univ. of Kan., 371 F.3d 1233, 1238 (10th Cir. 2004) (dismissing a retaliation claim for failure to exhaust administrative remedies because it was not part of a timely-filed EEOC charge); Martinez v. Potter, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (holding that "unexhausted claims involving discrete employment actions" are not viable, whether they occurred prior to the 300 day period or after the filing of the EEOC complaint); Davidson v. Am. Online, Inc., 337 F.3d 1179, 1184 (10th Cir. 2003) ("[A] continuing violation theory . . . is not permitted for claims against discrete acts . . . [t]hus, a claimant must file a charge . . . within the appropriate limitations period as to each such discrete act . . . that occurred."); Boyler v. Cordant Tech., Inc., 316 F.3d 1137, 1139 (10th Cir. 2003) (applying continuing violation theory to hostile work environment claim); Croy v. Cobe Laboratories, Inc., 345 F.3d 1199, 1202-03 (10th Cir. 2003) (construing plaintiff's EEOC complaint as a hostile work environment

-40-

claim and therefore applying the continuing violation doctrine to that claim).

As a result, the court has separately distinguished the alleged acts considered exhausted for plaintiffs' hostile work environment claims from the alleged acts considered exhausted for plaintiffs' other Title VII claims.   The hostile work environment claims are discussed, separately, <u>infra</u>.

### c.  Application

#### 1.  Semsroth

Semsroth filed with the EEOC on March 11, 2004. Therefore, her look back period includes exhausted allegations occurring between May 16, 2003 and March 11, 2004.  Semsroth exhausted the following claims from that period: 1) supervisors telling Semsroth in October 2003 that Semsroth's co-workers had called her a bitch and complained that Semsroth was milking calls but the supervisors failing to discipline the co-workers; 2) reporting to Semsroth's supervisors about not receiving backup by officer Nixon in October 2003 but those supervisors failing to discipline officer Nixon; 3) a closed door meeting interrogating females about the nature of a women's luncheon in October 2003; 4) a change in beats to beat 39 in December 2003; 5) after Semsroth's attorney made contact with the WPD, notes being made in her "files" regarding the situation; and 6) being ignored about the placement of an EEOC poster.

In her opposition to defendants motion for summary judgment, Semsroth alleged facts, albeit minimally with respect to some, only with respect to exhausted claims one through four.   Therefore, incidents five and six will not be considered; only incidents one

through four will be considered.

### 2. Voyles

Voyles filed with the EEOC on March 18, 2004.  Therefore, her look back period includes allegations between May 23, 2003 and March 18, 2004.  Voyles exhausted the following allegations from that period: 1) lieutenant Bohannon making comments about Voyles' body and eating habits while pregnant in December 2003; and 2) an oral reprimand from lieutenant Bohannon with media present during this same time period.

In her opposition to defendants' motion for summary judgment, Voyles alleged facts with respect to both incidents.

### 3. Warehime

Warehime filed with the EEOC on March 12, 2004.  Therefore, her look back period includes allegations between May 17, 2003 and March 12, 2004.  Warehime exhausted the following allegations from that period: 1) that in January 2004 she made a comment about a disease and was disciplined but other male officers have made similar comments and were not disciplined; 2) that in January 2004 she was interrogated as to why there was a women's luncheon by three male lieutenants; and 3) she was retaliated against after her attorney sent a letter to the City because she was next in line for a rotation but they stopped giving the rotations to her bureau after they received the letter.

In her opposition to defendants' motion for summary judgment, Warehime alleged facts only with respect to incidents one and two.  Warehime did not allege any facts with respect to incident three.  Therefore, only incidents one and two will be considered by the court.

### ii.   Consideration of Alleged Facts Not Present in the Parties' Pretrial Order

The City states, without supporting authority, that factual contentions now made by plaintiffs, but which were not contained within the parties' pretrial order, cannot now be considered by the court.  Plaintiffs do not respond to this argument by the City.

The parties struggled for weeks to prepare a pretrial order and submitted several drafts to the court for consideration.  (See Docs. 133, 136.)  A pretrial order was finally entered, but it is still riddled with objections.  (Doc. 142.)  Exasperated, the Court allowed the filing of such an order to prevent further delay of the case and reserved ruling on the objections made in the pretrial order.  (Doc. 141.)

The plaintiffs' factual contentions in the pretrial order were quite lengthy, comprising 22 pages of text.  One of defendants' objections to the pretrial order related to the relevance of certain statements in the plaintiffs' factual contentions.  Additionally, defendants asserted that plaintiffs made allegations in the pretrial order that had not been made in the most recent amended complaint.

The court need not further consider the issue, however.  After completing the above analysis of plaintiffs' timely, exhausted claims, it is clear that the contentions defendants complain of are no longer under consideration.

### 2.  Disparate Treatment

To make a case of disparate treatment, an employee must show: 1) she is a member of a protected class; 2) she suffered an adverse employment action; and 3) similarly situated employees received treatment different from that employee.  Paloni v. City of Albuquerque

-43-

Police Dep't, Nos. 05-2131, 05-2338, 2006 WL 3791286, at *3 (10th Cir. Dec. 27, 2006) (citing Trujillo v. Univ. of Colo. Health Sci. Ctr., 157 F.3d 1211, 1215 (10th Cir. 1998)).  All plaintiffs are female, and, therefore, there is no dispute that plaintiffs are a member of a protected class.

An adverse employment action is one which constitutes "a significant change in employment status, such as hiring, firing, or failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  "An adverse employment action must be materially adverse to the employee's job status."  Duncan v. Manager, Dep't of Safety, City & County of Denver, 397 F.3d 1300, 1314 (10th Cir. 2005) (internal quotation omitted).  The challenged employment action is materially adverse if a reasonable employee might have been dissuaded from making or supporting a charge of discrimination.  Burlington Northern & Sante Fe Ry. v. White, __ U.S. __, 126 S. Ct. 2405, 2415 (2006). "Reassignment of job duties is not automatically actionable."  Id. at 2417.

To show disparate treatment, an employee must also show that she was treated differently than a similarly situated employee. Plaintiffs must establish that they were "similarly situated to [the co-employee treated differently] in all relevant respects."  McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006).

> Similarly situated employees are those who deal
> with the same supervisor and are subject to the
> same standards governing performance evaluation
> and discipline.  In determining whether two
> employees are similarly situated, a court should
> also compare the relevant employment

> circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees. Moreover, even employees who are similarly situated must have been disciplined for conduct of comparable seriousness in order for their disparate treatment to be relevant.

Id. at 745 (internal citations omitted). In McGowan, the Tenth Circuit found two co-employees were not similarly situated where the co-employees had different job responsibilities, were "not subject to the same policies, statutes and findings of wrongdoing," and had different levels of culpability in an underlying incident. Id.

Disparate treatment claims are evaluated under the framework announced in McDonnell Douglas Corp v. Green, 411 U.S. 792, 802-03 (1973). Once a plaintiff has made a prima facie showing of disparate treatment, the burden then shifts to defendants to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1212 (10th Cir. 2003). The plaintiff then responds by demonstrating that the employer's reasons for the adverse action are pretextual. Id.

For ease of consideration, the court will analyze each of plaintiffs disparate treatment claims separately. These disparate treatment claims are: 1) generalized disparate treatment claims based on allegedly unequal discipline, the denial of positions and training opportunities, the denial of transfer requests, and the denial of awards; 2) a hostile work environment claim; 3) claims of retaliation; and 4) a claim of disparate treatment based on a "pattern or practice"

of disparate treatment.[7]

### i.  Generalized Disparate Treatment

### a.  Unequal Discipline

### 1.  Semsroth

Semsroth has not exhausted any claims for disparate treatment related to underlined unequal discipline.  Related to the broad area of discipline, Semsroth has exhausted two claims.  Semsroth alleges that: 1) supervisors told her in October 2003 that her co-workers had called her a bitch and complained that she was milking calls, but the supervisors did not discipline the co-workers; and 2) Semsroth's supervisors did not discipline officer Nixon for failing to back her on a call in October 2003.  These claims are not, however, disparate treatment claims because Semsroth has not shown that she was treated differently, only that the employees were not punished.  Moreover, Semsroth has not stated how she suffered an adverse employment action.

### 2.  Voyles

Voyles has exhausted one claim related to the broad area of

---

[7] Plaintiffs make a brief argument that the "inexorable zero" concept should be applied to their disparate treatment claims. Defendants are correct in their reply, however, that this concept is not applicable to the facts underlying this litigation.  The inexorable zero concept has been described by the Tenth Circuit as follows: "Under certain circumstances an inference of discrimination may sometimes be drawn from statistical evidence that no member of a protected group has ever occupied a particular job or position." Marion v. Slaughter Co., No. 98-6286, 1999 WL 1267015 (10th Cir. Dec. 29, 1999).  As expressly stated, this concept is limited and no plaintiff here has been denied a position which no woman has ever assigned.

Plaintiffs also attempt to assert that the statistics they propound should be used as evidence for their disparate treatment claims.  Plaintiffs do not, however, analyze for the court which statistics are applicable to which claims and do nothing to show the court how the statistics mentioned are relevant to the disparate treatment claims that they have exhausted.

discipline, but has not alleged all elements of a prima facie case of disparate treatment with regard to her discipline.  Voyles alleges that she was given an oral reprimand from lieutenant Bohannon with media present.  Voyles does not allege, however, how she was treated differently than a fellow male officer with respect to this incident.

### 3.  Warehime

Warehime has exhausted one claim for disparate treatment related to unequal discipline.  Warehime alleges that in January 2004, she made a comment about a disease and was disciplined for this comment but other male officers have made similar comments and were not disciplined.  Warehime alleges an adverse employment action based on her "discipline."  Assuming that her discipline qualifies as an adverse employment action, Warehime still has not met her prima facie burden for her disparate treatment claim because she has not created a genuine issue of material fact that she was treated differently than similarly situated employees.

The facts show that Warehime was disciplined in January 2004 for gossiping.  However, the similarly situated male employees identified who violated the same regulation at the WPD were similarly disciplined.  A male officer, officer Finkeldei was given a written reprimand for violating WPD 3.405 (A) (the WPD regulation prohibiting gossip).  This incident was mentioned in his evaluation.  Officers Clayton Schuler, Erik Landon, Jason Pfeifer, and Michael Miner have also been investigated for violations of WPD regulation 3.405.  The charges of a violation of regulation 3.405 were not sustained, however, so the four were not disciplined.  Warehime has not shown how the behavior for which she was disciplined was similar to the conduct

for which the male officers were investigated.  As a result, Warehime has not identified how she was treated differently than the identified fellow employees.

### b.  Denial of Positions and Training Opportunities

No plaintiff has exhausted any claims for disparate treatment related to a denial of positions or training opportunities.

### c.  Denial of Transfer Requests

No plaintiff has exhausted any claims for disparate treatment related to a denial of a transfer request.

### d.  Denial of Awards

No plaintiff has exhausted any claims for disparate treatment related to a denial of awards.

### ii.  Hostile Work Environment

A violation of Title VII is established if a plaintiff proves that "discrimination based on sex has created a hostile or abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  To establish a sexually hostile work environment, an employee must show: 1) the employee is a member of a protected group; 2) the employee was subject to unwelcome harassment; 3) the harassment was based on sex; 4) because of the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the employee's employment and created an abusive work environment. Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007).  An employer creates a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis

-48-

v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998).

To make a determination of a hostile work environment, the court must consider "the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007) (internal quotations and citations omitted).  Determining whether an actionable hostile work environment claim exists requires an examination of "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quotations omitted).  When an employee alleges a hostile work environment through actions that are not sexual by their nature, a more fact intensive analysis is necessary. Spain v. Gallegos, 26 F.3d 439, 447 (3d Cir. 1994).[8]

"An employer will not be liable under Title VII if the employer was not on actual or constructive notice of the alleged harassment. Actual knowledge is usually demonstrable where the plaintiff has reported harassment to management-level employees." Harsco, 475 F.3d at 1188 (Title VII hostile work environment claim); see also Duncan,

_____

[8]     Regarding an allegation of a racially hostile work environment, the Tenth Circuit recently stated in Herrera v. Lufkin Indus., 474 F.3d 675, 680 (10th Cir. 2007), that "[a] plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs.  Instead, there must be a steady barrage of opprobrious racial comments." (internal quotation omitted).  This makes it clear that to survive summary judgment on a hostile work environment claim, a genuine issue of material fact must exist as to a consistently offensive environment.

-49-

397 F.3d at 1310 ("An employer is absolved of liability for acts of harassment by its employees if it undertakes remedial and preventive action 'reasonably calculated to end the harassment.' If the employer's response ends the harassment by the employee in question, we presume that the remedial action was sufficient."). However, liability exists when the employer either knew or should have known of the harassment and failed to take prompt remedial action. <u>Hicks v. Gates Rubber Co.</u>, 833 F.2d 1406, 1418 (10th Cir. 1987).

The court has previously delineated which of plaintiffs' claims have been exhausted (and, of those exhausted claims, which are currently being pursued). Plaintiffs urge the court to also consider under the continuing violation theory "[a]ll acts that occurred since they have been employed with the force" because the City "has maintained an environment that is continuously discriminatory toward females, works to suppress female officers in lower positions, has ostracized Warehime since 2001 after reporting Officer Kilts, and purposely keeps the number of women suppressed." (Doc. 169 at 35.)

As stated above, the continuing violation doctrine permits consideration of unexhausted incidents of alleged discrimination for hostile work environment claims, as long as "an act" contributing to a hostile work environment took place within the limitations period for filing the EEOC charge. <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 117 (2002). For the continuing violation doctrine to apply, however, there must be a relationship between acts alleged after the beginning of the filing period and the acts alleged before the filing period. <u>Duncan</u>, 397 F.3d at 1308-09. In addition, a court can consider the history of acts comprising the hostile work environment

-50-

only if the employee did not unreasonably delay the filing of a hostile work environment claim. <u>Duncan</u>, 397 F.3d at 1308. To make this determination, a court should look at the type of the acts, the frequency of the acts, and the perpetrator of the acts. <u>Duncan</u>, 397 F.3d at 1309.

The court has previously determined that this theory does not apply to the discrete act disparate treatment claims discussed above. The court will now consider, in conjunction with each plaintiff, the application of the theory to plaintiffs' hostile work environment claims and the facts alleged.

### a. Semsroth

As stated above, Semsroth's exhausted claims that she continues to pursue are: 1) supervisors telling Semsroth in October 2003 that Semsroth's co-workers had called her a bitch and complained that Semsroth was milking calls but the supervisors failing to discipline the co-workers; 2) reporting to her supervisors that officer Nixon failed to back her in October 2003 but her supervisors not disciplining officer Nixon; 3) a closed door meeting with females interrogating the females about a women's luncheon; and 4) a change in beats in December 2003.

Semsroth also alleges the following incidents: 1) in 2000, officer Kilts sexually assaulted her; 2) in 2000, officer Kilts asked her for a date and came to her home and beat on the doors and windows until she told him to leave; 3) Semsroth has heard things that were inappropriate; 4) Semsroth has heard of male officers making comments about female officers' breasts; 5) officer Bartel said Semsroth was "hot"; 6) sergeant Kennedy made comments about Semsroth being blonde

-51-

and dumb; 7) lieutenant Hanley, in addition to telling Semsroth that other officers thought she was a bitch, told Semsroth she should let her hair down and go out for beers with "the guys"; 8) Semsroth has heard a lieutenant refer to a female victim of a rape crime as a "whore"; 9) Semsroth thought sergeant Chambers unjustifiedly followed her; 10) Semsroth believes she was passed over for an award regarding a suspicious character call; 11) Semsroth believes she was denied support during emergency calls; 12) Semsroth believes evaluations and merit award evaluations are conducted subjectively and this has discouraged her from applying for promotions; 13) Semsroth believes there is a negative attitude toward women in the WPD; 14) Semsroth believes she was passed over for an award regarding a June 2002 shooting incident; 15) Semsroth received a mocking photo and note in her locker from officer Tucker and he was not disciplined; 16) at some point prior to visiting Leiker in 2003, officer Byers showed Semsroth the shaved areas of his genitals; 17) deputy chief Stolz told Semsroth that any complaint she made to him he would investigate but that the investigated officer would be exonerated within thirty days; 18) Semsroth was no longer offered the opportunity to teach training sessions after she made complaints about gender issues; and 19) Semsroth was denied the opportunity for continuing education hours above the minimum of forty that are required. Unless identified with a particular date, these incidents have no time frame alleged for their occurrence.

For the court to consider these acts as part of the alleged hostile work environment claim under the continuing violation theory, Semsroth must show a relationship between the alleged acts that

occurred after the beginning of the filing period and the acts that occurred before the beginning of the filing period. Out of the above lengthy list, only a few can fairly be said to relate to the exhausted claims.

The allegation that lieutenant Hanley, in addition to telling Semsroth that other officers thought she was a bitch, told Semsroth she should let her hair down and go out for beers with "the guys" is related in temporal scope to the allegation of lieutenant Hanley's failure to discipline Semsroth's fellow officers for calling Semsroth a bitch. The incident was also perpetrated by the same individual, lieutenant Hanley. Semsroth's allegation that she was denied support during emergency calls is related to the exhausted allegation that she did not receive back-up on a call from officer Nixon in October 2003. It is not known if the two allegations are of the same temporal scope or whether they were perpetrated by the same individuals, but the claims are certainly of the same character. Finally, the allegation by Semsroth regarding a failure to discipline officer Tucker based on the mocking photo and note he left in her locker, when viewed with a liberal eye, is related to Semsroth's exhausted claims. Officer Tucker is the same individual involved in Semsroth's exhausted claim about his failure to back her on a call. In addition, Semsroth has exhausted claims concerning failure to discipline male officers. In the same vein, the allegation by Semsroth that she was unfairly passed over for an award arising out of the June 2002 shooting incident is related to officer Tucker's photo and note mocking Semsroth for not receiving an award. The allegation that Semsroth believes she was passed over for an award regarding a suspicious character call will

-53-

be similarly considered, as background.

Semsroth's other allegations, although very large in number, simply do not relate to the exhausted incidents or provide relevant background for the exhausted claims. Semsroth's exhausted claims have nothing to do with hearing gender-based inappropriate remarks, officer Kilts' sexual assault of Semsroth or officer Kilts harassing Semsroth for a date, officer Byers showing Semsroth his genitals, being followed, investigation procedure, training, or continuing education. Semsroth should have timely exhausted these allegations if she wished that they be pursued. The allegations do not concern the same individuals, many are unknown as to their time frame of occurrence, and they are of a wholly different character than Semsroth's exhausted allegations. See, e.g., Duncan, 397 F.3d at 1309-10 (holding that an anonymous letter and adjustment of a score on an exam are not related to harassing statements, rumors, and an anonymous article, even though there was a temporal relation, because "they are of a different character, they took place while [the plaintiff] was on a different assignment, and they were not perpetrated by the same people"); Holmes v. Utah, Dep't of Workforce Servs., __ F.3d __, 2007 WL 1140359, at *4-6 (10th Cir. 2007) (applying the Morgan and Duncan continuing violation analysis to four individual plaintiff's sex-based hostile work environment claims).

As a result, the allegations before the court for consideration for Semsroth's hostile work environment claim are: 1) lieutenant Hanley telling Semsroth in October 2003 that Semsroth's co-workers had called her a bitch and complained that Semsroth was milking calls but the supervisors failing to discipline the co-workers; 2) lieutenant

Hanley telling Semsroth she should let her hair down and go out for beers with "the guys;" 3) Semsroth reporting to Semsroth's supervisors about not receiving backup by officer Nixon in October 2003 but those supervisors failing to discipline officer Nixon; 4) denial of support during emergency calls; 5) a closed door meeting interrogating females about the nature of a women's luncheon in October 2003; 6) a change in beats to beat 39 in December 2003; 7) Semsroth's supervisors failing to discipline officer Tucker because of the mocking photo and note he left in her locker; and 8) Semsroth not receiving awards for her participation in a June 2002 shooting and a suspicious character call.

Considering the acts properly before the court on this claim, the court finds that Semsroth has not created a genuine issue material fact with respect to her hostile work environment claim.  First, Semsroth has not shown through these incidents how she was harassed based on sex.  Only two incidents could possibly be classified as gender-based: lieutenant Hanley telling Semsroth that she should "let her hair down" and the closed-door meeting with females regarding the women's luncheon.  Regarding lieutenant Hanley's suggestion to Semsroth that she should "let her hair down," while this comment was arguably inappropriate, as opposed to teasing, it is insufficient to create a genuine issue of material fact with respect to Semsroth's hostile work environment claim.  See, e.g., Braden v. Cargill, Inc., 176 F. Supp. 2d 1103, 1113 (D. Kan. 2001) (granting summary judgment on a hostile work environment claim where the plaintiff alleged only acts that could be considered inappropriate but were not sufficient to unreasonably interfere with the plaintiff's work performance);

-55-

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (instructing that a single statement which "'engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII"). Regarding the questioning about the women's luncheon, Semsroth alleges no facts regarding the questions asked about the women's luncheon and the court therefore has no way to evaluate whether those questions were gender-based. Further, Semsroth does not even allege how this incident was offensive. See, e.g., Bolden v. PRC Inc., 43 F.3d 545, 554 (10th Cir. 1994) ("General harassment if not racial or sexual is not actionable.").

More important, Semsroth has not shown that the alleged conduct was severe or pervasive such that it created an abusive work environment.[9] The acts, in total, do not show a pervasive use of gender-based discrimination such that the conduct would unreasonably interfere with Semsroth's work environment. The allegations are not physically threatening or humiliating, occurred infrequently, and were not severe.[10]   See, e.g., Faragher v. City of Boca Raton, 524 U.S.

---

[9] The court realizes that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is 'quintessentially a question of fact.'" O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1098 (10th Cir. 1999). However, when a plaintiff makes allegations which, even if believed by a jury, could not constitute a severe and hostile work environment, the court may enter summary judgment against the plaintiff.

[10] Furthermore, the Court has previously found that exhausted incidents one, two, and three are not violations of Title VII. Croy v. Cobe Laboratories, Inc., 345 F.3d 1199, 1203 (10th Cir. 2003) (finding that because the plaintiff did not establish any actionable acts of discrimination within the limitations period, the doctrine of continuing violations did not apply). Semsroth has failed to create a genuine issue of material fact with respect to her hostile work environment claim.

775, 778 (1998) (stating that when evaluating allegations of a hostile work environment claim for severity and pervasiveness, courts should "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing); Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) (stating factors to consider in evaluating the severity and pervasiveness of a hostile work environment claim as the frequency of the conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance); Carrasco v. Boeing Co., 190 Fed. Appx. 650 (10th Cir. 2006) (affirming grant of summary judgment on hostile work environment claim based on sex (allegations of four harassing statements) because no rational jury could conclude that these statements, made over a one-year period caused the plaintiff's workplace to be permeated with discriminatory intimidation, ridicule and insult); Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257 (10th Cir. 1998) (affirming grant of summary judgment on hostile work environment claim based on sex (allegations of one gender-based comment and four acts of unwanted physical contact regarding one female employee and four gender-based comments regarding another female employee) because the alleged incidents were isolated, took place over a four-year period, and many of which did not occur because of the plaintiff's sex); Gross v. Burggraf Const. Co., 53 F.3d 1534, 1547 (10th Cir. 1995) (affirming a grant of summary judgment where the plaintiff alleged crude and rough comments used by the employer in reprimanding and motivating, because the comments were not related to the plaintiff's gender).

### b. Voyles

Voyles' exhausted claims are: 1) lieutenant Bohannon making comments about Voyles' body and eating habits while she was pregnant in 2003; and 2) an oral reprimand from lieutenant Bohannon with media present.   Voyles also alleges the following incidents: 1) she was directed to a safe post during an emergency call by a male supervisor and male officers took over the call; 2) she has heard co-employees refer to female officers as "dykes;" 3) in 2002, Voyles applied for an assignment to the SCAT unit but believes a male officer was given the assignment instead of her; 4) on May 4, 2002, Voyles applied for assignment to the exploited and missing children's unit but a male officer was granted the assignment instead of her; 5) on June 24, 2002, Voyles applied for assignment to the mounted unit but a male officer was chosen; 6) on December 2, 2002, Voyles received a one-day suspension for failing to file a report but male officers violating the same regulation have not been disciplined as harshly; 7) Voyles believes her December 2002 evaluation regarding community meeting attendance was more harsh than evaluations of male officers; 8) Voyles was moved from a light-duty assignment in the gang unit to a light-duty assignment in the records unit after she filed her lawsuit; 9) in 2005, Voyles applied for drug recognition expert training but the training was given to a male officer; 10) in March 2005, Voyles applied for an assignment to the mounted unit but a male officer was chosen.   Unless identified with a particular date, these incidents have no time frame alleged for their occurrence.

For the court to consider these acts as part of the alleged hostile work environment claim under the continuing violation theory,

-58-

Voyles must show a relationship between the alleged acts that occurred after the beginning of the filing period and the acts that occurred before the beginning of the filing period.  The exhausted acts that occurred during the filing period involve only comments made by lieutenant Bohannon.  These comments involved Voyles' weight, eating habits, and work product.  Out of the above lengthy list, only one of Voyles' allegations can be said to relate to the exhausted claims.  Voyles' allegation that she was moved from a light duty assignment in the gang unit to a light duty assignment in the records department after filing her lawsuit is related to her exhausted claims.  Voyles was told she was moved to keep her from working near lieutenant Bohannon.  All Voyles' other allegations, however, are not related to her exhausted claims.  They are not the same type of incidents and were not perpetrated by the same supervisor.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 120 (2002) (listing the factors for a court to consider when applying the continuing violation theory as the "same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers").

Therefore, the only allegations the court will consider with respect to Voyles' hostile work environment claim are the comments by lieutenant Bohannon and the transfer in light duty positions as a result of lieutenant Bohannon's presence.  It is clear that from these allegations that Voyles cannot make a case for hostile work environment against the City.  First, the comments made by lieutenant Bohannon about Voyles' weight and eating habits and the transfer in light duty assignments are not the type of incidents so "severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment" such that a jury could find a hostile and abusive work environment. <u>Davis v. U.S. Postal Serv.</u>, 142 F.3d 1334, 1341 (10th Cir. 1998); <u>but see</u> <u>Zisumbo v. McCleodUSA Telecomms. Servs.</u>, 154 Fed. Appx. 715, 726 (10th Cir. 2005) (reversing a lower court's grant of summary judgment on a sex-based hostile work environment claim because the evidence showed that 75% of the time the plaintiff's supervisor referred to the plaintiff as "prego" while she was pregnant and thus the harassment was pervasive).  Second, there is no allegation that the oral comments made by lieutenant Bohannon with media present were gender motivated, gender related, or even untrue.  <u>See</u> <u>Stahl v. Sun Microsystems, Inc</u>, 19 F.3d 533, 538 (10th Cir. 1994) ("If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment.").  Considering all the circumstances, the  incidents alleged by Voyles were not frequent or severe and can not establish a prima facie case of hostile work environment. <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002) (determining whether an actionable hostile work environment claim exists requires an examination of "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance").

### c.  Warehime

Warehime's exhausted claims that she continues to pursue are: 1) in January 2004 she was unfairly disciplined for gossiping; and 2) in January 2004 she was interrogated by three male lieutenants as to why

there was a women's luncheon.  Warehime also alleges the following incidents: 1) other people have made comments about Warehime's short stature; 2) other officers have referred to female victim's of rape crimes as "whores" and supervisors giggled along with it when this happened; 3) other officers have said that female officers would get their butts kicked if involved in physical combat; 4) other people have commented on Warehime's ability to back them on calls; 5) while on a call with two male officers, the male officers left the scene without informing Warehime; 6) officer Kilts told Warehime that he had raped a woman and after Warehime reported this incident to her supervisors, Warehime was told by a fellow officer that other officers did not trust Warehime after the incident; 7) in 2001, officer Kilts exposed himself to Warehime; 8) Warehime has applied for school resource officer assignments and transfers to a different patrol but these were denied; 9) in 2005, the gang unit took credit for Warehime's ideas for a gang coalition.[11]  Unless identified with a particular date, these incidents have no time frame alleged for their occurrence.

    For the court to consider these acts as part of the alleged hostile work environment claim under the continuing violation theory, Warehime must show a relationship between the alleged acts that occurred after the beginning of the filing period and the acts that occurred before the beginning of the filing period.  The exhausted acts that occurred during the filing period are that Warehime was

---

[11]  "The hostile work environment underlying a Title VII claim may include acts taking place after the plaintiff files an EEOC charge if those acts contribute to the same hostile work environment that existed during the filing period."  Duncan, 397 F.3d at 1310.

unfairly disciplined and was interrogated about a women's luncheon by male lieutenants in January 2004.  The additional incidents alleged by Warehime all involve allegations of comments about appearance and ability, a lack of back-up, behavior by officer Kilts, denial of assignment requests, and a failure to receive credit for a project. None of these incidents is related to either unfair discipline or supervisor questioning about women's meetings.

As a result, the only allegations this court will consider for Warehime's hostile work environment claim are an allegation of unfair discipline and supervisor questioning.  As stated above with respect to Voyles' claims, these are neither the type nor frequency necessary to support a hostile work environment claim.  Being treated unfairly one time by a superior and having to answer questions about what was discussed at a women's lunch do not constitute a hostile and abusive work environment.

### iii.  Retaliation

Title VII makes it unlawful to retaliate against an employee because the employee has opposed any practice made unlawful by Title VII, or because the employee has "participated . . . in an investigation, proceeding or hearing."  42 U.S.C. § 2000e-3(a).  The elements of a prima facie claim of retaliation under Title VII are: 1) the employee engaged in protected opposition to discrimination; 2) the employee suffered an adverse employment action during or after her protected opposition that a reasonable employee would have found materially adverse; and 3) a causal connection exists between the protected activity and the materially adverse action.  McGowan v. City of Eufala, 472 F.3d 736, 741 (10th Cir. 2006); Paloni v. City of

Albuquerque Police Dep't, Nos. 05-2131, 05-2338, 2006 WL 3791286, at *3 (10th Cir. Dec. 27, 2006).  "Once the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  If the employer does so, the burden shifts back to the plaintiff to show that the employer's reasons are pretextual."  McGowan, 472 F.3d at 741 (citations omitted).

The finding of an adverse employment action is required for a retaliation claim.  See Paloni, 2006 WL 3791286, at *3 (stating that a finding of an adverse employment action is a prerequisite to Title VII claims arising out of disparate treatment stemming from the imposition of discipline and retaliation).  "A challenged employment action is adverse for the purposes of a claim for retaliation under Title VII if a reasonable employee would have found it materially adverse. . . . [A]n employer's action is adverse under Title VII if it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.[12]  McGowan, 472 F.3d at 742 (internal quotations and citations omitted).

A prima facie case of retaliation next requires a showing of

---

[12]  If a plaintiff alleges that the materially adverse action is the hostile work environment, then additional considerations must be made.  "[T]he complained-of harassment must be sufficiently severe to qualify as a materially adverse action under Title VII.  In addition, to succeed on a retaliation claim based on a hostile work environment, a Title VII plaintiff must present evidence that supervisory or management personnel either 1) orchestrated the harassment of the plaintiff by other employees, or 2) knew about the harassment and acquiesced in such a manner as to condone it.  The behavior complained of must render the workplace permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  McGowan, 472 F.3d at 743 (internal quotations and citations omitted).  Plaintiffs do not make such a claim.

-63-

causation.  First, in order to show a causal connection, the employer must have been aware of the employee's protected activity and the plaintiff must establish that knowledge.  See, e.g., Petersen v. Utah Dep't of Corrs., 301 F.3d 1182, 1190 (10th Cir. 2002) (stating that "an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII" and finding that causation was not established on a denial of promotion adverse employment action claim because no one in the decisionmaking process "even knew of her protected opposition").

The required link between the protected activity and subsequent adverse employment action can then be inferred if the action occurs within a short period of time after the protected activity.  O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001).  However, "[u]nless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."  Id.; Piercy v. Maketa, __ F.3d __, 2007 WL 901911, at * 4 (10th Cir. Mar. 27, 2007) ("A retaliatory motive may be inferred when an adverse action closely follows protected activity.  However, unless the termination is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999))).

### a.  Semsroth

Semsroth has exhausted and presents only one claim related to retaliation.  Semsroth alleges she was retaliated against because her beat assignment was changed to beat 39.  Semsroth alleges she engaged

-64-

in protected opposition to discrimination when she met with Leiker, the WPD's equal employment officer.  Semsroth first met with Leiker on October 27, 2003.  She never made a formal written complaint with Leiker, but it is clear she discussed issues she felt were discriminatory.  Semsroth informed Leiker about her issues involving recognition, the incident where she was informed that other officers referred to her as a bitch, and retaliatory conduct because of verbal complaints she had made to supervisors about gender issues.  Because Semsroth made an informal complaint about the type of discrimination that is prohibited by Title VII, she has properly alleged the first element of her prima facie claim.  See Robbins v. Jefferson County Sch. Dist. R-1, 186 F.3d 1253, 1258 (10th Cir. 1999) (holding that informal complaints to superiors or the use of the employer's internal grievance procedures constitutes protected activity under Title VII).

Semsroth then alleges that her transfer to beat 39 was an adverse employment action.  In Burlington N. & Sante Fe Ry. v. White, the Supreme Court found that an employee involuntarily transferred to a less desirable position had stated a material adverse employment action under Title VII, even though the duties of both positions were similar.  126 S. Ct. 2405, 2416-18 (2006).  The Burlington Northern Court noted, however, that "reassignment of job duties is not automatically actionable."  126 S. Ct. at 2417.  The Tenth Circuit, in a case decided after the Burlington Northern decision, has stated:

> After Burlington Northern we have continued to examine claims of adverse action through a case-by case approach, examining the unique factors relevant to the situation at hand.  The materiality of a claimed adverse action is to be determined objectively; petty slights, minor annoyances, and simple lack of good manners will not deter a reasonable worker from making or

> supporting a charge of discrimination. . . .
> Even prior to <u>Burlington Northern</u>, we found
> adverse action if it constitutes a significant
> change in employment status, such as hiring,
> firing, failing to promote, reassignment with
> significantly different job responsibilities, or
> a decision causing a significant change in
> benefits.

<u>McGowan</u>, 472 F.3d at 742 (internal quotations and citations omitted).

Taking the facts in the light most favorable to Semsroth, Semsroth has created a genuine issue of material fact with respect to this element. Semsroth alleges beat 39 is referred to as a banishment beat not only because of its location on the outer edge of the city, but also because it is where officers are assigned when they are new or for disciplinary reasons. Sergeant Wiley testified that an assignment to a banishment beat could have a negative impact on an officer's career advancement because it offered less opportunity for involvement in high profile calls. It is undisputed that there are fewer calls on this beat and that officers on beat 39 are often called to help on other beats. When Sergeant Watts told Semsroth about her assignment to beat 39, he characterized it as "bad news." While on beat 39, Semsroth's rate of pay did not change, but she received fewer overtime opportunities. Applying the standards articulated above, an objective view of Semsroth's alleged facts show her alleged materially adverse employment action is similar to the action found adverse in <u>Burlington Northern</u>. Semsroth has established a genuine issue of material fact with respect to this element. <u>See also</u> <u>Wells v. Colo. Dep't of Transp.</u>, 325 F.3d 1205, 1214-15 (10th Cir. 2003) (finding a transfer materially adverse when, although the plaintiff retained the same rate of pay, her job duties and responsibilities "dramatically" changed); <u>Stinnett v. Safeway, Inc.</u>, 337 F.3d 1213, 1216 (10th Cir.

-66-

2003) (finding a materially adverse employment action where a reduction in the level of responsibility and skill required for different positions had been established); but see Sanchez v. Denver Public Schs., 164 F.3d 527, 532 (10th Cir. 1998) (finding that a "purely lateral transfer" of a teacher to a different elementary school was not a materially adverse employment action).

To make a prima facie case, Semsroth must next show a causal connection exists between the protected activity and the materially adverse action. It is clear that Semsroth's employer knew of her protected opposition activity. Semsroth met with the City's own equal employment officer and Leiker directly communicated with Semsroth's supervisors about Semsroth's communications with her. The circumstances here also suggest that this should be considered a close-proximity case. Semsroth first met with Leiker in late October 2003 and met with her subsequent to that first meeting. Leiker communicated directly to Semsroth's supervisors about Semsroth's discussions with her. In December 2003, Semsroth's superiors then made the beat transfer of Semsroth to beat 39. In addition, the period between the time Semsroth first met with Leiker and the alleged materially adverse employment action was no more than two months. See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) ("[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation."). Because of these circumstances, Semsroth has alleged facts to cause a genuine issue of material fact with regard to causation.

Because Semsroth has stated a prima facie case of retaliation, the burden now shifts to the City to articulate a legitimate, nondiscriminatory reason for Semsroth's transfer to beat 39. The City asserts that Semsroth was transferred to beat 39 because of her turmoil with other officers. Sergeant Wiley stated that Semsroth was having personality conflicts with other people on her shift. Semsroth's supervisors, sergeant Chambers and sergeant Watts, received complaints from other officers about Semsroth. These complaints were that Semsroth had poor time management and that because of her poor time management there was animosity with other officers on Semsroth's beat. Semsroth was also complaining about other officers on her beat and those officers' time management. Based on these facts, the City has stated a legitimate nondiscriminatory reason for Semsroth's transfer to beat 39. Animosity amongst employees assigned to the same job is a sufficient reason to break those employees up. The fact that Semsroth was alleged to have poor time-management skills is a sufficient reason for moving her to the beat with fewer calls and activity.

The burden now shifts back to Semsroth to show that the City's reasons for her transfer to beat 39 are pretextual.[13]   Semsroth

---

[13]   Plaintiffs devote multiple pages of their response brief to a discussion of a mixed-motive proof of pretext. (See Doc. 169 at 39-43.) As discussed above, plaintiffs failed to establish a prima facie case on their generalized unequal treatment claims, so the application of the mixed-motive analysis was not necessary.  With respect to plaintiffs' retaliation claims, Semsroth is the only plaintiff who makes a prima facie showing, thus making the McDonnell Douglas burden shifting framework and a showing of pretext by plaintiffs relevant.
    Plaintiffs argue that the Supreme Court's holding in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), changed the familiar McDonnell Douglas framework.  Plaintiffs ask the court to remove the pretext analysis from the summary judgment analysis.  (Doc. 169 at

attempts to show pretext based on the fact that her 2001, 2002 and 2003 evaluations note that Semsroth had good time-management skills. Semsroth 2001 evaluation rates her quantity of work as "check-plus" in the box for "produces the required amount of work."  The text of her 2001 evaluation then states: "Officer Semsroth spends an appropriate amount of time on calls and makes herself available for calls when needed."  In a later section, it is stated that "Officer Semsroth makes good use of her time."  Semsroth's 2002 evaluation rates her quantity of work as a "check" in the box for "Produces the required amount of work."  The text of her 2002 evaluation contains the following comments: 1) "Officer Semsroth can be relied upon to complete tasks in a timely manner;" 2) "Officer Semsroth produces the required amount of work;" 3) "Officer Semsroth makes good use of her time; she completes her work in a reasonable amount of time using her time management skills;" and 4) "Officer Semsroth will review her monthly statistics, which are lower than the previous evaluation period."

Semsroth's 2003 evaluation rates her quantity of work as a

---

43.)  Defendants point out that the Supreme Court has continued to utilize the McDonnell Douglas framework, citing Raytheon Co. v. Hernandez, 540 U.S. 44 (2003).
This court is not prepared to disregard at the summary judgment stage of the proceedings the over thirty-year reign of McDonnell Douglas and its progeny in cases of discrimination based on indirect evidence.  The court thinks it doubtful that the Supreme Court intended such consequence without the slightest reference to McDonnell Douglas in its Desert Palace opinion.  The court instead views the holding of Desert Palace as limited to the new rule of law expressly set forth therein: "[i]n order to obtain [a mixed-motive] instruction under § 2000e-2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'"  Desert Palace, 123 S. Ct. at 2155.

"check" in the box for "Produces the required amount of work."  The text of her 2003 evaluation repeats the first and second comments from her 2002 evaluation and alters the third comment only slightly to read: "She makes reasonably good use of her time; she completes her work in a reasonable amount of time using her time management skills." (i.e., the comment is "reasonably good" in 2003, rather than "good" in 2002.)  Semsroth's 2003 evaluation notes that her "statistics have gone down in some categories while others have stayed about the same compared to last year's performance."  Semsroth's 2003 evaluation then notes the complaints from Semsroth regarding other officers' time management and the "several complaints" from fellow officers about Semsroth's time management.

Semsroth states no other basis for finding pretext and states no gender-based reason for finding pretext.  The basis she alleges is unfounded.  It is clear from a review of her 2001, 2002, and 2003 evaluations that Semsroth's time management skills were a matter of concern.  Her quantity of work rating decreased from 2001 to 2002 (from her first to second year with the WPD) and her statistics then declined or stayed the same from her second to third year with the WPD.  Semsroth has failed to show pretext and her claim for retaliation therefore fails.  See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10 th Cir. 1999) (stating that to show pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons"

-70-

(quotation omitted)).   Semsroth has not carried her burden on this claim.

### b.  Voyles

Voyles has exhausted no claims related to retaliation.

### c.  Warehime

Warehime exhausted one claim for retaliation, but, as stated above on page 42, she presents no facts in regard to her exhausted retaliation claim.

### iv.  Pattern and Practice

Plaintiffs argue they "are entitled to a pattern and practice burden shifting trial format as announced in Thiessen v. General Electric Corp., 267 F.3d 1095, 1106 (10th Cir. 2001)." (Doc. 169 at 43.)   In Thiessen, the Tenth Circuit outlined the trial approach to be taken in class action claims alleging pattern or practice discrimination.[14]   267 F.3d at 1106.   A pattern or practice claim changes the burdens imposed on the parties and requires, initially, only that a discriminatory policy existed, rather than that each individual plaintiff was the victim of a discriminatory policy.   Id.

Plaintiffs cite heavily from the Thiessen case, but do not identify for the court how Thiessen applies to the facts underlying their claims.   Plaintiffs state only that "[h]ere, plaintiffs have alleged that the City of Wichita has engaged in a pattern and practice of discrimination." (Doc. 169 at 44.)   Plaintiffs perform absolutely no factual analysis, do not apply their theory to the facts of their

---

[14]   A pattern or practice claim asserts that it was the employer's standard operating procedure to discriminate against employees on the basis of a protected characteristic.   Thiessen, 267 F.3d at 1105.

case, and do not address how their allegations against defendants somehow fit into a pattern or practice analysis.  Significantly, plaintiffs have not identified <u>how</u> a pattern or practice analysis saves any of their claims from summary judgment.

In addition, it is clear to the court that the <u>Thiessen</u> pattern or practice format applies only to class-action claims, not individual claims as exists in this litigation.  <u>Thiessen</u> directly states that "[p]attern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination." 267 F.3d at 106.  Plaintiffs claim that <u>Thiessen</u> was not limited to class actions because it did not expressly state that it was.  This argument is contradicted by the language of the opinion itself, however, because the opinion is clear it is discussing the application of the pattern or practice theory to a class-action claim. For these reasons, the court rejects plaintiffs' arguments in this regard.

### 3. Disparate Impact

The Tenth Circuit recently discussed the difference between disparate impact and disparate treatment claims under Title VII:

> Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.'  The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.  Proof of discriminatory motive . . . is not required under a disparate-impact theory.

<u>Carpenter v. Boeing Co.</u>, 456 F.3d 1183, 1186-87 (10th Cir. 2006)(citing <u>Int'l Bd. of Teamsters v. United States</u>, 431 U.S. 324, 335 n.15 (1977)).

To establish a prima facie case of disparate impact under Title VII, an employee must show that "a specific identifiable employment practice or policy caused a significant disparate impact on a protected group." Carpenter, 456 F.3d at 1187; see also 42 U.S.C. § 2000e-2(k)(1)(A)(I) ("An unlawful employment practice based on disparate impact is established . . . only if . . . a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of . . . sex.").

First, the employee must identify the specific employment practice causing a discriminatory practice. Wards Cove Packing Co., Inc. v. Antonio, 490 U.S. 642, 656 (1989) (holding that employees alleging disparate impact claims under Title VII are responsible for "isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities"). "[A] plaintiff must show that there is a legally significant disparity between (a) the gender composition, caused by the challenged employment practice, of the pool of those enjoying a job or job benefit; and (b) the gender composition of the qualified applicant pool, i.e., the pool from which potential qualified applicants might come." Carpenter, 456 F.3d at 1193 (internal citations, quotations and alterations omitted).

Plaintiffs assert disparate impact claims based on excessive subjectivity in the WPD's policies and procedures for promotion, discipline, hiring, and termination. (Doc. 169 at 46.) Defendants respond that the allegations plaintiffs exhausted do not involve any allegation that could be construed as a claim of disparate impact. (Doc. 155 at 25-26.) In addition, defendants argue that plaintiffs

-73-

have not asserted they have been adversely affected by the WPD policies. (Doc. 155 at 26.)

Several of the underlying EEOC charges in this case reference the WPD discipline system. Thus, because the facts underlying the WPD disciplinary system appear in the administrative charge, a disparate impact claim based on discipline is reasonably related to the disparate treatment claims asserted by plaintiffs. See Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998) (disparate impact claim was reasonably related to failure to promote disparate treatment claim where EEOC investigation would have included investigation of promotion policies and their effect on minority employees); Gomes v. Avco Corp., 964 F.2d 1330 (2d Cir. 1992) (same, where investigation of disparate impact claim would reasonably have flowed from an investigation of disparate treatment claim; complaint simply asserted two different theories of relief to remedy particular incidents of discrimination described in EEOC charge). Williams v. Sprint/United Mgmt. Co., No. 03-2200-JWL, 2005 WL 1801605, at *3 (D. Kan. July 29, 2005) (allowing amendment of the complaint to assert a claim for disparate impact, despite the fact that plaintiffs had not expressly exhausted this claim, because, inter alia, the facts underlying the plaintiffs disparate impact claim were referenced in the EEOC charges and therefore the disparate impact claim was reasonably related to the exhausted disparate treatment claims).

Regarding their disparate impact claim based on excessive subjectivity in discipline, plaintiffs make only a paucity of allegations. Plaintiffs propound their expert, Dr. Bardwell, in support of their disparate impact claim based on discipline. In

-74-

total, plaintiffs state the following with respect to Dr. Barwell's statistical analysis regarding discipline:

> Females are investigated at a statistically higher rate than males. (Bardwell Rep. at 20.) This created a statistical disparity well above that necessary to display a prima facie case of discrimination. (Id.). This disparity far exceeds the 0.50 level required to establish a prima facie case of discrimination. (Bardwell Rep. at 21).

(Doc. 169 at 20 ¶ 22.)

Plaintiffs claim of disparate impact based on excessive subjectivity in discipline fails for several reasons. First, plaintiffs never establish <u>what</u> the statistical disparity between female and male investigations actually is, or whether a statistical disparity in investigations led to a statistical disparity in actual discipline.[15] Plaintiffs only argue that the disparity is enough to make a prima facie case, but never establish the statistical methodology used or the basis against which it is to be measured. In addition, plaintiffs rely on Dr. Bardwell's report but it has not been authenticated, and, as defendants point out, cannot be relied upon by plaintiffs without authenticating the report in the record. <u>See</u>

---

[15] The cited portion of Dr. Bardwell's report does not match the number used by plaintiffs regarding the "level required to establish a prima facie case." Dr. Bardwell's report states that the gender disparity in the number of females investigated "is statistically significant at the 0.011 level, exceeding the 0.05 threshold." Regarding the gender disparity in the number of females whose violations were found sustained, Dr. Bardwell stated that the "disparity is statistically significant at the <0.001 level, far exceeding the 0.05 threshold."

Beyond not placing the statistics in the record, plaintiffs make no attempt whatsoever to establish the significance of these statistics. Plaintiffs cite no case law or any legal authority on this point. The court will not construct plaintiffs arguments for them when plaintiffs, who are represented by counsel, have made no effort in this regard.

Boldridge v. Tyson Foods, Inc., No. 05-4055-SAC, 2007 WL 846517, at *1 (D. Kan. Mar. 20, 2007) (refusing to consider a physician's report when ruling on a motion for summary judgment because the report was not authenticated or stipulated to).

Finally, and most significantly, even if the court found that plaintiffs had created a genuine issue of material fact with respect to Dr. Bardwell's statistical evidence of disparate impact, this is not enough for plaintiffs' prima facie claim. An individual plaintiff making a disparate impact claim must show that he or she "personally has been the victim of discrimination by the general practice which allegedly resulted in a discriminatory impact on a protected group." Coe v. Yellow Freight Sys., Inc., 646 F.2d 444, 451 (10th Cir. 1981). The court has previously reviewed the claims of the plaintiffs regarding unfair discipline and found that no plaintiff could make a prima facie showing of disparate treatment based on discipline. See supra pages 46-47. As a result, the disparate impact claim based on discipline fails as well.

Plaintiffs additional claims of disparate impact also fail. Plaintiffs assertions of disparate impact based on excessive subjectivity in promotions, hiring, and termination were not related to any claims presented to the EEOC. As a result, claims of disparate impact based on these allegations have not been exhausted and the court need not consider them. See, e.g., Boldridge v. Tyson Foods, Inc., No. 05-4055-SAC, 2007 WL 846517, at *7 (D. Kan. Mar. 20, 2007) (finding an ADA disparate impact claim not exhausted where it was not like or reasonably related to the plaintiff's allegations in his EEOC charge) (citing Pacheco v. Mineta, 448 F.3d 783, 792 (5th Cir. 2006)

(finding that plaintiff did not exhaust his disparate impact claim where his charge detailed only disparate treatment claims and did not identify any neutral employment policies)); <u>Gray v. Oracle Corp.</u>, No. 2:05-CV-534 TS, 2006 WL 2987941, at *2 (D. Utah Oct. 17, 2006) (refusing the amendment of a complaint to add a claim for disparate impact, based on futility, because the plaintiff did not include a disparate impact claim in his EEOC charge and therefore did not exhaust a disparate impact claim).

## B.  Section 1983 Claims

Section 1983 prohibits "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting under color of law.   42 U.S.C. § 1983.   Plaintiffs generally allege that Chief Williams: 1) was aware of discriminatory practices and ignored them; and 2) retaliated against plaintiffs by instigating disciplinary actions after receiving notice of their lawsuits.[16]  (Doc. 142 at 6-7.)

### 1.  Qualified Immunity

Chief Williams half-heartedly raises a qualified immunity defense by stating, in a brief paragraph, the standards of law related to qualified immunity.  However, Chief Williams provides no analysis on this point.   On the other hand, plaintiffs did not respond to defendants' qualified immunity argument.  The Court will not explore this issue without any briefing by the parties.

---

[16]   The parties' pretrial order brings claims under § 1983 against Chief Williams in his personal capacity. (<u>See</u> Doc. 142 at 40.)  All plaintiffs, i.e., Semsroth, Voyles, Warehime, and Plush, bring these claims.

### 2.  Temporal Scope of the Claims

In Kansas, an action brought under § 1983 is subject to a two-year statute of limitations.  Brown v. Unified Sch. Dist. 501, 465 F.3d 1184, 1188 (10th Cir. 2006); Hamilton v. City of Overland Park, Kan., 730 F.2d 613, 614 (10th Cir. 1984) (stating that because Congress has not enacted a statute of limitations applicable to § 1983, all § 1983 claims should be characterized as actions for injury to the rights of another and that Kansas' statute of limitations for such an action is two years); Kan. Stat. Ann. § 60-513(a)(4) (stating that an "action for injury to the rights of another" shall be brought within two years).

Plaintiffs do not respond to Chief Williams' argument that plaintiffs' § 1983 claims are limited by the two-year statute of limitations.  Because the court, below, finds that plaintiffs have not alleged facts that could fulfill a prima facie case against Chief Williams, an analysis of the temporal scope of the claims is not necessary.

### 3.  Prima Facie Claim

"Under § 1983, when a defendant is sued in his individual capacity, the complaint must allege facts that show the defendant personally participated in the alleged violation.  Consistent with this rule, the court has held that a supervisor cannot be held liable for his employees' actions based solely on his supervisory position.  Rather, there must be some affirmative link between the alleged deprivation and the supervisor's control or failure to supervise."  Esnault v. Burnett, 83 Fed. Appx. 279, 282 (10th Cir. 2003) (internal citations omitted); see also Beedle v. Wilson, 422 F.3d 1059, 1073-74

-78-

(10th Cir. 2005) ("In order to impose supervisor liability under §
1983, it is not enough for a plaintiff to show a defendant was in
charge of other state actors who actually committed the violation.
Rather, the plaintiff must establish a deliberate, intentional act by
the supervisor to violate constitutional rights." (internal quotation
omitted)).

    "Supervisors are only liable under § 1983 for their own culpable
involvement in the violation of a person's constitutional rights."
Serna v. Colo. Dep't of Corrs., 455 F.3d 1146, 1151 (10th Cir. 2006)
(internal quotations and citations omitted).   A plaintiff must
establish a "deliberate, intentional act by the supervisor to violate
constitutional rights.   In short, the supervisor must be personally
involved in the constitutional violation, and a sufficient causal
connection must exist between the supervisor and the constitutional
violation."  Id.   "Because mere negligence is not enough to hold a
supervisor liable under § 1983, a plaintiff must establish that the
supervisor acted knowingly or with deliberate indifference that a
constitutional violation would occur."  Id.

### 4.  Analysis

    In the parties' pretrial order, plaintiffs state that Chief
Williams was aware of allegedly discriminatory practices (unequal
discipline, denial of positions and training opportunities, and denial
of transfer requests) and ignored them, despite having ultimate
responsibility for policies and practices in the WPD.  (Doc. 142 at
6.)  The pretrial order also alleges that Chief Williams told officers
to dig up information on plaintiffs.  (Doc. 142 at 7.)  Finally, with
respect to plaintiff Plush, the pretrial order alleges Chief Williams

"made" officer Tucker report alleged misconduct of Plush and initiated "several complaints" against Plush after her litigation was filed. (Doc. 142 at 7.)

Plaintiffs as a group have failed to create a genuine issue of material fact with regard to Chief Williams' personal involvement in any of the alleged acts of discrimination asserted by plaintiffs. In addition, plaintiffs have not shown how Chief Williams' conduct was intentionally or purposefully discriminatory.

### i. Semsroth

Semsroth does not allege that Chief Williams was personally involved in any action against her. As stated above, this failure is fatal to Semsroth's personal capacity claims against Chief Williams.

### ii. Voyles

In the pretrial order, Voyles alleged that Chief Williams was involved in unequal discipline against her because he has never approved a penalty for a violation of WPD regulation 5.802 that was the same as the discipline Voyles was given. (Doc. 142 at 12.) The uncontroverted facts show, however, that Voyles received her discipline because of a violation of WPD regulation 3.911, while the male officers Voyles compares herself to received their discipline because they violated WPD regulation 5.802. As a result, although Chief Williams may have ultimately approved discipline that was given to Voyles, Voyles has not alleged any facts showing Chief Williams was personally involved in discriminatory action taken against her.

### iii. Warehime

Warehime does not allege that Chief Williams was personally involved in any action against her. As with plaintiff Semsroth,

Warehime's failure to allege a genuine issue of material fact with respect to Chief Williams' personal involvement in any action against her is fatal to Warehime's personal capacity claims against Chief Williams.

### iv. **Plush**

Plush makes the allegation that Chief Williams told officers to "find what they can" on plaintiffs and supports this assertion by reference to three investigations of her conduct at the WPD that were instigated shortly after her lawsuit was filed.[17]  Chief Williams' motion for summary judgment asserts, by way of affidavit from Chief Williams, that Chief Williams did not give such a directive.  (Doc. 155 at 20 ¶ 142 (citing Williams' Affidavit, Exh. 27).)

Plush attempts to controvert Chief Williams' statement by citing her deposition testimony, an incident report filed by officer Tucker, and an officer's report of the investigation of the incident reported by officer Tucker.  (Doc. 169 at 12-13 ¶ 142.)  These citations do not controvert Williams' statement that he did not give a directive for other officers to "dig up" information on Plush.  The cited deposition testimony states only that Plush believes she was retaliated against and that deputy chief Stolz initiated investigations against her.  The exhibits also do not establish that Chief Williams directed officers to dig up information on Plush.  Rather, they are simply officer Tucker's incident report describing the writing on his truck and the "Officer's Report" from sergeant Chaney detailing his investigation of the incident.  Neither exhibit indicates in any way that Chief

---

[17]   The other plaintiffs make the same allegation, but do not support the allegation with any evidence of investigations into their conduct that were instigated after this alleged directive was given.

Williams asked his officers to "dig up dirt" on plaintiffs in retaliation for the filing of their lawsuit.

The officer's report does indicate that officer Tucker reported that Chief Williams asked officer Tucker to make his incident report after seeing officer Tucker's truck with the comments on the windows at an in-service they both attended. The report also states, however, that deputy chief Stolz requested the actual investigation into the matter. Regardless, Chief Williams only personal involvement in any disciplinary action taken by the WPD against Plush was asking an officer who had inappropriate writing on his truck windows to make an incident report about the officer who had written the comments. There is no evidence that Chief Williams was personally involved in any other disciplinary action taken against Plush. Plush does not even allege that the other incidents for which she was investigated shortly after filing her lawsuit were the result of personal involvement by Chief Williams.

As a result, Plush has failed to create a genuine issue of material fact with respect to Chief Williams' personal involvement in any discrimination against her which violated her equal protection rights. Plush's claims brought via § 1983 fail.

## IV. CONCLUSION

Defendants' motion for summary judgment (Doc. 154) is GRANTED. The clerk is ordered to enter judgment pursuant to Rule 58. Defendants' motions to strike plaintiffs' experts (Docs. 137, 139) are denied as moot.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged. The standards governing motions

to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed five pages.  No reply shall be filed.

      IT IS SO ORDERED.

      Dated this   27th   day of April, 2007, at Wichita, Kansas.

                              S/ Monti Belot
                              Monti L. Belot
                              UNITED STATES DISTRICT JUDGE